[Cite as *State v. Johnson*, 195 Ohio App.3d 59, 2011-Ohio-3143.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| THE STATE OF OHIO, | : | APPEAL NO. C-090620 |
| | | TRIAL NO. B-0809899-A |
| Appellee, | : | |
| | | *O P I N I O N.* |
| v. | : | |
| | | |
| JOHNSON, | : | |
| | | |
| Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed in Part, Sentences Vacated in Part, and Cause Remanded

Date of Judgment Entry on Appeal: June 29, 2011

Joseph T. Deters, Hamilton County Prosecuting Attorney, and Philip Cummings, Assistant Prosecuting Attorney, for appellee.

Bruce Hust, for appellant.

J. HOWARD SUNDERMANN, Judge.

{¶1} Following a jury trial, defendant-appellant, Sontez Johnson, was convicted of murder, felonious assault, and having weapons while under a disability in connection with the shooting death of Swede Moorman.

{¶2} Johnson raises three assignments of error on appeal: (1) the trial court erred in imposing separate sentences for the felony murder and felonious assault of Moorman because they were allied offenses of similar import under R.C. 2941.25, (2) the trial court violated his right to confrontation under both the Ohio and United States Constitutions when it permitted three of the state's witnesses to testify at trial by two-way video, and (3) his convictions were against the manifest weight of the evidence.

{¶3} Finding merit in only his first assignment of error, we vacate the sentences for the murder and felonious assault involving Moorman and remand this case for resentencing on only one of those two offenses. We otherwise affirm the trial court's judgment and sentences.

## I. The State's Case Against Johnson

{¶4} In the early morning hours of July 8, 2008, Cincinnati police officer David Sprague was on uniformed patrol in Evanston, a high-crime area, when he heard five or six gunshots in the area of the St. Leger Apartments. As he responded to the area, a Dodge Ram truck came speeding toward his cruiser. The truck went through some landscaping, severed a street sign, and sideswiped a cement pole before coming to rest in the parking lot of a local business, Jack's Carryout.

{¶5} Sprague called for additional police units and approached the vehicle. When he saw the driver slumped over the steering wheel with a gunshot wound to his left shoulder, he immediately called for emergency assistance. The paramedics arrived minutes later, rendering aid to the victim, but he died at the scene.

{¶6}    In the meantime, the police had begun cordoning off a two-block area, so they could secure the scene for the collection of evidence.  Criminalists recovered three bullet fragments, five .45-caliber shell casings, and two .40-caliber shell casings near a group of cars on the street in front of the St. Leger Apartments.  Inside the victim's vehicle, they recovered a .45-caliber bullet from the headrest of the driver's seat, a credit card, and a small bag of marijuana.  They also found five separate bullet holes in the victim's vehicle:  one bullet hole was in the window frame of the driver's door; a second bullet hole was in the back of the driver's seat headrest; a third bullet hole was in the headliner of the vehicle; a fourth bullet hole was located between the bed and cab of the truck; and a fifth bullet hole was in the rear lower portion of the driver's seat.   Despite the large crowd of people who were out that night, the police were unable to locate any witnesses to the shooting.

### A.  Police Interviews with Leaks, James, and Higgins

{¶7}    The police subsequently identified the victim as Swede Moorman.  Two days later, they got a break in their investigation when Kenneth "Tom Tom" Leaks came to the police station at the insistence of his aunt.   Leaks met with Detective Jenny Luke and her partner, Terry McGuffey, who were in charge of investigating Moorman's death.  Leaks told police that he had heard that they were looking for him; that he had not been involved in the shooting; and that two men he knew only as "Lil LA" and "T-Red" had been shooting at the truck.  Leaks provided police with phone numbers for T-Red and Lil LA from his cellular phone, and he then left town.

{¶8}    In an effort to learn the two men's identities, the police subpoenaed the phone records for the two numbers. The records showed that the phone number for T-Red was listed to a Rico Johnson living on Gilbert Avenue, with a date of birth of February 15, 1988.  The phone number for "Lil LA" matched the date of birth and known address for Leal Higgins.

{¶9} The police subsequently received information that another man, David James, who lived in the St. Leger Apartments, had knowledge of the shooting. Detective Luke went to his residence multiple times, but was unable to locate him. As a result, she flagged James's name in the police computer and entered a notation asking her fellow officers to notify her if James was stopped or arrested, so she could question him about the shooting.

{¶10} On November 1, 2008, uniformed officers came into contact with James, saw Detective Luke's notation, and brought James in for questioning. James was upset that he had been brought in for questioning and did not want to talk to police. When James was asked about the shooting, he told police that he had been standing outside when he saw a group of young girls get out of a black pickup truck. The driver of the vehicle was swearing at the girls. James also said that two men were walking down the street, but that he did not know who they were. He said, "I got to live over there, and I got kids." Detective Luke then attempted to persuade him to talk further based on what she knew about Moorman's family. James was unwilling to say the name of the perpetrator, but he told Luke that he would agree with Luke if she provided him with the correct name. He then told police that he was standing in front of his house. James did not know if both men had guns. He said that there were two. Detective Luke showed James a photograph of Kenneth "Tom Tom" Leaks, and he acknowledged that he knew him, but he insisted that Leaks was not at the scene of the shootings.

{¶11} When Detective Luke mentioned the name T-Red to James, he got very quiet. He said, "You don't understand." And then he finally said that T-Red was one of the men at the scene, indicating that he was familiarly known by that name and that he used to live down the street on Gilbert Avenue. He said that T-Red was one of the men arguing with Swede Moorman. Detective Luke then showed him two or three photographs that she

thought might be T-Red, but James said that none of them was T-Red. She then showed him a photograph of Leal Higgins, whom he identified as "Lil LA."

{¶12} Luke's partner, Terry McGuffey, then asked James if those were the two men who had fired the weapons. James told police that he did not know if both of them had fired. They were together. James told police that he did not know which one shot; he just knew that both men were there.

{¶13} Several days later, Detective Luke used the police computer to check the address connected with the phone records for T-Red, and she came across the name Sontez Johnson. She then placed Sontez Johnson's photograph into an array and contacted James.

{¶14} James was scared and upset that Detective Luke had contacted him, but he nonetheless agreed to meet her on November 4, 2008, two streets from his home, to look at the array. When he saw Detective Luke, he quickly got into her vehicle and looked at the photo array that contained Sontez Johnson's photograph. He immediately identified Johnson from the array. James was then shown a second photo array, which included a photograph of Leal Higgins, and he identified Higgins from that array.

{¶15} On December 26, 2008, Detective Luke interviewed Leal Higgins, who was in the London Correctional Facility for an unrelated probation violation. Higgins confessed to his involvement in the crime, identifying himself and Johnson as the shooters. Higgins told police that Johnson carried a .45-caliber handgun. Higgins added that Leaks had also been carrying a gun that night, but that Leaks had only fired the gun in the air. Higgins told police that he had shot his weapon, a .40-caliber Glock pistol, two or three times that night at the bed of Moorman's vehicle. He further told police that he had hidden the gun in the apartment of Chanel Bassett. Police subsequently recovered Higgins's pistol exactly where Higgins had claimed it was in Bassett's apartment.

{¶16}   In January 2009, Detective Luke traveled to Georgia to interview Leaks. She showed him two separate photo arrays. Leaks identified Johnson from one array and Higgins from the other.  Detective Luke interviewed Leaks a third time in Cincinnati.  She testified that she had coaxed Leaks into returning to Cincinnati by telling him that he could receive money from Crime Stoppers.  During the interview, she confronted Leaks with Higgins's statement that Leaks had been shooting a gun that night.  Leaks admitted that he had been carrying a gun that night, but he claimed that it had been inoperable.

### B.  The Intimidation of James, Leaks, and Higgins at Johnson's Trial

{¶17}   Johnson was subsequently charged in connection with Moorman's death, and his case proceeded to trial before the jury.   On the second day of trial, the assistant prosecuting attorney informed the court that David James had failed to appear in court, and the prosecutor asked the court to issue a warrant for James's arrest so that he could be brought forward to testify.  Defense counsel raised no objection to the state's request, and the trial court issued the arrest warrant.  The court then took a lunch recess.

{¶18}   Following that recess, the court held an in-chambers discussion with defense counsel, the assistant prosecuting attorney, and the state's designated representative, Detective Luke.  Defense counsel waived Johnson's presence.  The assistant prosecuting attorney informed the court that following the lunch recess, 15 young black men had walked into the courtroom and had sat down behind him and Detective Luke so that they could see the witnesses and that they were all still sitting in the courtroom in an effort to intimidate the state's witnesses from testifying.

{¶19}   Detective Luke explained to the court that when the police had arrived to arrest David James, there were numerous young black men congregated in front of James's apartment.  When one of the officers had asked the young men to leave, one young man had told the officers that they would see them in court.

{¶20} When the officers knocked on James's apartment door, they were met by James's wife and son. James's wife told police that following James's appearance in court the previous day, "there were carloads of boys that were driving by with their fingers and/or guns or both out of the window saying, 'David James, you show up to court, pow pow. David James, you show up to court, pow pow.' " James was so "spooked" that he told his wife, "I don't care what happens, this is a death wish, I'm just not going, I can't go." As a result, the police had been unable to locate James.

{¶21} The prosecuting attorney then told the court that two other state's witnesses, Kenneth Leaks and Leal Higgins, had also indicated that they were terrified of testifying because of all the tough young men that Detective Luke had just described. Detective Luke told the court that she had witnessed some intimidation from these young men the previous day, when she was with another state's witness, Kenneth Leaks, in the hallway outside the courtroom. The young men were all tapping their feet, looking at Leaks, and making gestures with their hands. She told the court that she had not been aware of everything because she was not paying close attention, but that Leaks had known what it meant and that he was so intimidated by the young men that he had asked her to place him in handcuffs. For the remainder of the day, she and Leaks had acted as though Leaks had been handcuffed, just to get through the situation.

{¶22} The assistant prosecuting attorney then asked the court for a recess so that he could investigate the possibility of presenting these three witnesses' testimony by two-way closed-circuit television. The trial court expressed some concern about the procedure, stating that if it permitted the televised testimony, the witnesses would have to testify in the presence of their attorneys to ensure that they were not being pressured during their testimony. Defense counsel objected to the state's presenting the witnesses'

testimony by two-way closed-circuit television, arguing that it would violate Johnson's Sixth Amendment right to confrontation.

{¶23}   When the trial resumed, the assistant prosecuting attorney stated in open court in the presence of Johnson's friends and family, but out of the presence of the jury, that he was asking the court for a recess for the remainder of the afternoon so he could explore the possibility of presenting some of the state's witnesses' testimony by two-way video.  The assistant prosecuting attorney stated that there were people present in the courtroom who were attempting to intimidate the state's witnesses from testifying.  He argued that the state had information in regard to David James, who was a witness called before the lunch recess and who now had a warrant issued for his arrest, that there was a group of young black males with guns in vehicles at James's residence the previous night, driving up and down the streets, and making gestures as though they were going to shoot him.  The police had been unable to locate James because he was afraid that testifying in the case would jeopardize his life.

{¶24}   Defense counsel objected, arguing that many of Johnson's friends and family were present in court to support Johnson—not to intimidate the state's witnesses—and that permitting these witnesses to testify by two-way closed-circuit television would not only violate Johnson's right to face-to-face confrontation, but would also impede counsel's ability to effectively cross-examine the witnesses.

{¶25}   The trial court granted the state's motion to recess the trial for the day, but told the parties that it was withholding a ruling on the state's motion to utilize the two-way closed-circuit television to present testimony until the state had had an opportunity to address the feasibility of such a procedure and defense counsel had had an opportunity to provide the court with any case law on the matter.

{¶26}   The following day, the assistant prosecuting attorney told the court that arrangements had been made for the witnesses to testify live from a room in the Hamilton County Justice Center.  He argued that when Kenneth Leaks had been in the courtroom, he had been very intimidated by the people there.  He had subsequently informed his counsel that he was terrified to testify and that he would not testify if all these people remained in the courtroom.

{¶27}   The assistant prosecuting attorney told the court that David James was in a similar situation. James had come to court the first day of the trial and had seen all the individuals that were present.   After court that day, those individuals had appeared outside his home and threatened him, and he was terrified of testifying.  The assistant prosecutor argued that a number of young men had positioned themselves outside James's apartment the following day, had come into contact with the police, and had told the police they would see them in court.  Shortly thereafter, a group of 15 to 20 young men had, in fact, come into the courtroom.  The prosecuting attorney stated that because of this witness intimidation, he was asking that these witnesses be permitted to testify by using the two-way closed-circuit television.

{¶28}   Defense counsel objected, arguing that the procedure was not constitutionally permissible because it would limit her ability to cross-examine the witnesses with an aerial view of the crime scene.  Counsel also indicated that she had spoken with the defendant's friends and family the previous day, explaining to them that their presence could be construed as intimidating. She argued that the televised testimony was unnecessary because she had not seen any young people in the hallway and because none of Johnson's family and friends were presently in the courtroom.

{¶29}   After hearing the arguments of counsel, the trial court denied the prosecution's motion, expressing concern about defense counsel's ability to fully cross-

examine the witnesses and to make use of the exhibits she had intended to use. The trial court stated, however, that it would keep that procedure in mind should it become necessary during the trial.

{¶30} The state then called Leal Higgins to testify. As soon as Higgins was brought into the courtroom, 15 to 20 young individuals walked into the courtroom. The assistant prosecuting attorney immediately brought the matter to the court's attention at a sidebar conference, renewing his motion that the witnesses be permitted to testify by two-way closed-circuit television due to the continued attempts to intimidate the state's witnesses from testifying.

{¶31} The trial court granted defense counsel's request for a brief recess to provide counsel with the opportunity to persuade some of the young people to leave the courtroom. After that recess, defense counsel represented at a sidebar hearing that she was still working on getting the people to leave. The prosecuting attorney renewed his motion to present the witnesses' testimony by two-way closed-circuit television. He told the court that Higgins's counsel had just informed him that when Higgins had seen these individuals in the courtroom, he had immediately turned to his counsel and told him that he would be invoking the Fifth Amendment and would not testify.

{¶32} The trial court then ruled that the state could present the testimony of David James, Kenneth Leaks, and Leal Higgins by two-way closed-circuit television. The court stated that the procedure was necessary to prevent what was an obvious attempt by the defendant's friends and family to intimidate the witnesses in the case:

{¶33} "Your client's family and friends have in the Court's observation orchestrated a dance in which they were going to appear to cooperate when you had suggested that they limit their presence and it was not helping him at this point. It's evident from the march into the courtroom immediately upon the witnesses being brought

in that there is an effort by his family and friends to intimidate the witnesses in this case and accordingly we are going to grant the prosecution's motion that the witnesses be permitted to testify by video."

{¶34} The court then asked Higgins's counsel in open court if Higgins would testify. Higgins's counsel informed the court that Higgins was invoking the Fifth Amendment and would not testify. The trial court then informed the parties that it was taking a brief recess, and that the trial would resume in another courtroom.

{¶35} Once the trial had resumed, the trial court stated the following concerning how the closed-circuit equipment would be utilized to obtain the witnesses' testimony: "We are in the magistrate's courtroom using the video equipment for arraignments and extradition hearings. There is a video monitor on the defense counsel table and on the prosecutor's table. They're able to see the witness who will be present in the room. At the other end of the system, there is a television set, available for the jury's viewing. There is a camera positioned in front of defense counsel in the event she wants to display any exhibit to the witnesses."

### C. Two-Way Video Testimony of James, Leaks, and Higgins

{¶36} Defense counsel maintained her objection, arguing that the procedure violated Johnson's right to confrontation. The state then called David James to testify. Although James had previously told police that he had seen Higgins and Johnson shoot Moorman, James repeatedly testified that he had not seen anyone shooting that night. James testified that he was outside that night, when he saw a man pull up and five or six girls get out of the vehicle. Everyone was yelling and asking about the identity of the person driving the truck, but James went on about his business. When he heard gunshots shortly thereafter, he ran into his apartment. He came back outside 30 minutes later. When he was later questioned by the police, he told them that he had not seen anything.

{¶37}   James further testified that he was afraid for his life, that he had come to court the first day of the trial, but that he had not come the following day because he had gotten the word in the community that if he appeared at the trial, he was a dead man.  He acknowledged that the police had to arrest him to get him to come to court.  He stated that he did not want to testify because he felt that his life was in danger, adding that he did not want anything whatsoever to do with the case.

{¶38}   Kenneth Leaks next testified by two-way video.  Leaks testified that he was being held in the Hamilton County Justice Center on an obstruction charge and that he was testifying in the presence of his attorney, who had informed him that as long as he testified truthfully in the case, the obstruction charge would be reduced from a felony charge to a misdemeanor charge.

{¶39}   Leaks testified that he was standing by himself when two young boys came and got him.  They told him that some girls were getting hit by a truck.  As he walked across the street to see what was happening, Higgins and Johnson came up next to him and started shooting.  He testified that Johnson had a black gun.  Higgins also had a gun and fired some shots at the truck.  The truck rolled on before hitting a pole.  He testified that he felt that by his mere presence at the scene, he was also going to be shot.  So he walked off towards his aunt's house.  Leaks testified that he had had a gun, a small .25-caliber weapon, that night but that he did not attempt to pull it out. He kept it in his hand in his pocket.

{¶40}   Two days after the shooting, his aunt had made him go to the police department.  He gave a statement to Detective Luke and let her see his cellular phone.  He had then left the state because he was worried that something was going to happen to him–"like getting killed or something."  He admitted that he had been interviewed a second time by Luke, but testified that he could not recall their conversation.  He further admitted telling

Detective Luke in a third interview that he had been carrying a .25-caliber gun on the night of the murder.

{¶41}    He testified that he knew Johnson only as T-Red and Higgins as Lil LA.  He denied giving Detective Luke T-Red's or Lil LA's phone number.  He further testified that he had come to court with Detective Luke on Monday and that he did not want to testify in the case.  Leaks admitted that he had been drinking alcohol and taking drugs the day of the shooting, but he testified that it had not impaired his ability to see the shooting.

{¶42}    Higgins next testified by two-way video.  He acknowledged that in exchange for his truthful testimony, the state was permitting him to plead guilty to a reduced charge of manslaughter and to receive a four-year prison sentence.  Higgins testified that his street name was Lil LA and that he was with Johnson, whose street name was T-Red, on the evening of July 7, 2007, in the back of the St. Leger Apartments, when he saw a truck pull into the driveway and turn around.  He heard some girls arguing with the driver of the truck. He saw one of the girls spit on the back of the driver's head and another girl snatch the driver's cellular phone, so he went to see what was going on.  As he was walking out from the apartment building, the driver, who was drunk, almost hit him with his truck.  The driver then turned around and was "talking stuff" to him, so Higgins pulled out his .40-caliber Glock.  When he heard David James yell that the driver had pulled out a gun, Higgins started shooting at the back of the bed of the truck as it was pulling away.  Kenneth "Tom Tom" Leaks and Johnson then started shooting.  Johnson had a .45-caliber weapon, while Leaks had a chrome revolver.

{¶43}    Higgins testified that he had been standing next to a group of parked cars when he fired three or four shots at the back of the bed of the truck.  Johnson, who had been standing next to him, was shooting at the driver's-side window of the truck.  One of Johnson's shots had hit a window, and it had shattered.  The truck kept moving before it

13

crashed. He and Johnson then ran from the scene. Higgins ran to Dixmont Avenue and left his gun in Chanel Bassett's apartment. He acknowledged that the police had recovered the gun from Basset's apartment, test-fired it, and determined that it was one of the guns used in the shooting.

{¶44} He further testified that he had been approached in December 2008 by police officers while he was in the London Correctional Facility and that he had told them that Johnson was the other shooter. He testified that he had not spoken with Johnson since the shooting. Higgins testified that he was confident that Johnson had a .45-caliber gun because Johnson had shown him the gun not long before the incident.

### D. The State's Remaining Evidence Against Johnson

{¶45} Detective Jenny Luke testified that she had investigated the death of Moorman. She testified that when she had initially arrived on the scene, there were no witnesses for her to interview and that she had returned to the crime scene the following day, going door to door, handing out business cards, and trying to talk to anyone who might have seen what had happened, but that no one had had any information. She testified about her investigation, including her interviews with Leaks, James, and Higgins. She testified that James's testimony was inconsistent with his prior statement. At defense counsel's request, James's entire statement to police was played for the jury.

{¶46} Paul Glindemeyer, a criminalist who had processed the crime scene and the victim's vehicle, testified that in his opinion, the shooters had been standing in between two cars in a group of four vehicles parked on the street or on the sidewalk next to the vehicles. He further testified that in his opinion, the lack of glass in the drivers' side of the vehicle and in the street meant that the driver's side window had been down at the time of the shooting, while the shattered glass in the back seat indicated that the rear driver's side window had been up at the time of the shooting.

{¶47}   Glindemeyer testified that he could not determine the sequence of the shots or what caliber of bullet had made the five bullet holes in the victim's vehicle, but that the varying sizes of the bullet holes was consistent with the testimony that both a .40-caliber pistol and a .45-caliber pistol had been fired at the vehicle.  He further testified that the bullet hole in the door frame of the driver's side of the vehicle was consistent with the bullet that had caused Moorman's death.

{¶48}   Dr. Gretel Stephens, a forensic pathologist and deputy coroner in the Hamilton County Coroner's office, testified that Moorman had died from a single gunshot wound to the torso, which had perforated his heart, lungs, aorta, and pulmonary artery.  She told the jury that his injuries were so extensive that he would have lived only a few minutes after being shot.  She further testified that from the position of the wound, she could tell that Moorman had been shot from a distance greater than two feet and that his arm had been forward as if his hand had been on the steering wheel when he had been shot.  Stephens testified that she had recovered a bullet from Moorman's right armpit during the autopsy and had forwarded it to John Heile, a firearms examiner for the Hamilton County Coroner's office, for examination.

{¶49}   John Heile testified that he had examined a .40-caliber Glock handgun that police had retrieved from Bassett's apartment, the autopsy bullet, and three sets of ammunition that police had recovered from the crime scene.

{¶50}   Heile was able to conclude that one set, which consisted of two .40-caliber cartridge casings, had been fired from the .40-caliber Glock pistol that police had recovered from Bassett's apartment.  A second set, consisting of five Independence-brand .45-caliber automatic cartridge casings, had each been fired from the same .45-caliber weapon.  Heile also examined a third set, which consisted of three bullet fragments, but he testified that the fragments were too small for him to determine anything about the type or caliber of the bullet

or what weapon they had been fired from. Heile testified that based upon the cartridge casings found at the scene, at least two weapons had been fired.

{¶51} Heile further testified that he had also compared the .45-caliber autopsy bullet and the .45-caliber bullet that had been recovered from the headrest of Moorman's vehicle with the five fired .45-caliber-automatic cartridge casings. Heile testified that he could not link the bullets with the cartridge casings, but that the five fired cartridge casings and the two bullets were consistent with ones that were fired from a Glock semiautomatic pistol. Heile admitted on cross-examination that there was a possibility that the bullets and cartridge casings had come from two different .45-caliber semiautomatic Glock pistols, but he further testified that in his opinion, the two .45-caliber bullets—the bullet recovered from Moorman and the bullet found in the driver's seat headrest of his vehicle—had been fired from the same gun.

## II.  *Johnson's Evidence at Trial*

{¶52} In his defense, Johnson presented testimony from his maternal grandmother, his mother, his aunt, and three teenage girls from the neighborhood. Johnson's mother, maternal grandmother, and aunt testified that he was among a group of 13 or 14 family members attending a birthday party at his grandmother's home. Johnson's grandmother testified that she lived on Gilbert Avenue, which was about 100 yards from the murder scene. The women testified that Johnson was upstairs playing video games with his cousins and came down to the kitchen shortly after hearing the gunshots that night. Johnson's mother further testified that Johnson had recently violated his probation for drug possession and that he had been staying inside his grandmother's home that night to avoid further trouble. On cross-examination, Johnson's mother confirmed that his birth date was the same date listed on the phone records for the phone number police had recovered for T-Red from Leak's phone. She further confirmed that the Gilbert Avenue address listed on the phone records for

16

T-Red was the same address for Johnson's grandmother's home and that Johnson had been living with his grandmother at the time of the shooting.

{¶53} Kanisha Freeman and Tania Harmon, two 15-year-olds living in Evanston at the time of the shooting, testified that they had attended school with Leaks and Higgins and that they knew Johnson because he was the father of Harmon's sister's baby. Both girls testified that they had approached defense counsel in the hallway during the trial and told her that they wanted to testify because they did not want to see the wrong person accused of the crime.

{¶54} They testified that they were standing on the corner of St. Leger with some friends in the early morning hours of July 8, 2007, when they saw a black pickup truck pull up with some of their friends. All the girls exited from the vehicle, except for one, whom the driver would not let out. The driver pulled forward with the girl still in the rear seat, but she managed to jump out of the vehicle and run to where Freeman, Harmon, and their friends were standing. The driver then rolled the truck up on the sidewalk and tried to hit them. They then heard somebody yell that the driver had a gun. Leaks then walked to the end of the driveway and stood near Leal Higgins, who had already started shooting at the truck. Leaks then started shooting at the truck. Both girls testified that they did not see Sontez Johnson that night. They further testified that they did not talk to the police on the night of the shooting.

{¶55} On cross-examination, Freeman admitted that she had been interviewed by the police sometime in 2008. She denied that her trial testimony was inconsistent with her prior statement to police that she had not witnessed the crime and that she had only heard of Leaks and Higgins but that she did not recognize either one. When asked whether she had lied to police, Freeman explained that she had not lied, but had simply not answered their questions. Freeman and Harmon further admitted that they were best friends, that Harmon's

sister was Johnson's girlfriend, and that Johnson was the father of Harmon's sister's child. Harmon testified on cross-examination that she was not afraid of testifying in the case. Both Freeman and Harmon testified that they had come to the courthouse with a large group of friends from Evanston.

{¶56} Iesha Leathers testified that she was 16 years old at the time of the shooting and that she lived across the hallway from David James in the St. Leger Apartments. She testified that she knew Johnson from the recreation center; she knew Leaks from spending time in Evanston; she knew Higgins from school; and she was good friends with Freeman and Harmon. She testified that she was standing in her kitchen when she heard gunshots and screaming. When she walked over to her living room and looked out the window, which faced the St. Leger Apartments, she saw Leaks run up on the porch and start ducking. She did not see anything in his hand. She spoke to him briefly before he jumped into a car and left.

### III. The Jury's Verdict and Johnson's Sentence

{¶57} The jury acquitted Johnson of purposefully murdering Moorman, but found him guilty of felony murder and two counts of felonious assault involving Moorman as well as one count of having a weapon while under a disability. At sentencing, the trial court merged the two felonious-assault charges. The trial court sentenced Johnson to 15 years to life for the felony murder, to eight years for felonious assault, to five years for the weapons offense, and to a three-year term on the merged firearm specifications. It ordered that the terms be served consecutively, for a total sentence of 31 years to life in prison.

### IV. Johnson's Right to Confrontation

{¶58} In his second assignment of error, Johnson argues that his right to confrontation under the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution was violated when the trial court permitted three of

the state's witnesses, David James, Kenneth Leaks, and Leal Higgins, to testify at trial by two-way closed-circuit television. He further claims that the use of the two-way closed-circuit television procedure precluded defense counsel from effectively cross-examining one of the state's witnesses, Kenneth Leaks, when he admitted having difficulty seeing some of the demonstrative aids during cross-examination.

{¶59} The Sixth Amendment to the United States Constitution provides, "[I]n all criminal prosecutions the accused shall enjoy the right * * * to be confronted with the witnesses against him." Section 10, Article I of the Ohio Constitution, likewise provides, "[T]he party accused shall be allowed * * * to meet the witnesses face to face * * *." Typically, this means that witnesses who testify against a defendant in a criminal proceeding must personally appear at the defendant's trial.

{¶60} The United States Supreme Court, however, has held that a defendant's right to face-to-face confrontation is not absolute and may be appropriately limited under certain circumstances.[1] In *Maryland v. Craig*, the Supreme Court explained that the Confrontation Clause reflects a preference for face-to-face confrontation at trial, a preference that must occasionally give way to considerations of public policy and the necessities of the case.[2] The court further held that a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where (1) the denial of such confrontation is necessary to further an important public policy and only where (2) the reliability of the testimony is otherwise assured by the other elements of the confrontation right, "including testimony under oath, the opportunity for cross-examination, and the

---

[1] See *Coy v. Iowa* (1988), 487 U.S. 1012, 1021, 108 S.Ct. 2798 (any exception to face-to-face confrontation "would surely be allowed only when necessary to further an important public policy"); see also *Maryland v. Craig* (1990), 497 U.S. 836, 850, 110 S.Ct. 3157; *Morales v. Artuz* (C.A.2, 2002), 281 F.3d 55, 58.

[2] *Craig*, 497 U.S. at 849.

opportunity for the judge, jury, and the defendant to view the witness's demeanor as he or she testifies."[3]

{¶61} While neither this court nor the Ohio Supreme Court has addressed whether a defendant's confrontation right is violated by the presentation of an adult witness's testimony by two-way closed-circuit television, multiple state and federal courts have read *Craig*'s references to "an important public policy" and "an important state interest" as suggesting a general rule that is not limited to protecting child victims of sexual offenses from the trauma of testifying in a defendant's presence.[4] These courts have likewise concluded that even though *Craig* concerned a statute that permitted child witnesses in sexual offenses to testify by one-way closed- circuit television, the state need not point to a statute that codifies the important policy interest it seeks to further before it may invoke *Craig*.[5]

{¶62} In this case, the trial court implemented the two-way closed-circuit television procedure based on its own observations, as well as the assistant prosecuting attorney's observations, that a large number of the defendant's friends and family had been intimidating three witnesses.[6] The trial court's comments on the record reveal that it was not predisposed to permit the state to present the testimony by two-way closed-circuit television, but that it permitted the testimony only out of necessity.

---

[3] Id. at 850-851.

[4] *Horn v. Quarterman* (C.A.5, 2007), 508 F.3d 306, 319-320; *People v. Wrotten* (2009), 14 N.Y.3d 33, 39-40, 923 N.E.2d 1099; *Harrell v. State* (1998), 709 So.2d 1364 (Florida Supreme Court held that the testimony of two foreign tourists, who had been assaulted and robbed while visiting Florida, by satellite transmission did not violate a defendant's right to confrontation); *Harrell v. Butterworth*(C.A.11, 2001), 251 F.3d 926; *United States v. Abu Ali* (C.A. 4, 2008), 528 F.3d 210; *United States v. Benson* (C.A.6, 2003), 79 Fed.Appx. 813, 820-821.

[5] See *Quarterman*, 508 F.3d at 320; see also *Wrotten*, 14 N.Y.3d at 39-40.

[6] See also *United States v. Gigante* (C.A.2, 1999), 166 F.3d 75 (a defendant's confrontation rights were not violated when a district court permitted a witness who was terminally ill and in the witness-protection program to testify by two-way closed-circuit television).

**{¶63}** This court is aware that witness intimidation is a widespread problem in Hamilton County, and it is disruptive of the administration of criminal justice.[7] The United States Supreme Court itself has recognized, "[W]hen defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce."[8] Indisputably, James's, Leaks's, and Higgins's testimony was critical to the state's case against Johnson. The trial court was understandably concerned that these witnesses be able to testify in a neutral setting because witnesses who are intimidated provide less reliable testimony, which defeats the truth-seeking goals of confrontation. The trial court's use of the two-way video procedure was necessary to further the public policy of justly resolving the criminal case, while at the same time protecting the well-being of the state's witnesses.[9]

**{¶64}** The trial court's use of the two-way closed-circuit television procedure additionally preserved the reliability of these witnesses' testimony. James, Leaks, and Higgins appeared with their counsel in the Hamilton Justice Center, they were sworn by the court, they gave testimony, and they were subjected to a rigorous, live cross-

---

[7] See, e.g., *State v. Lewis*, 1st Dist. Nos. C-050989 and C-060010, 2007-Ohio-1485, at ¶ 15-25; *State v. Grimes*, 1st Dist. No. C-030922, 2005-Ohio- 203; see also Goldschneider, "Choose Your Poison: A Comparative Constitutional Analysis of Criminal Trial Closure v. Witness Disguise in the Context of Protecting Endangered Witnesses at Trial," (2004) 15 Geo.Mason U.Civ.Rights L.J. 25, 45 ("Studies have shown that witness intimidation is a widespread problem that is 'more disruptive of the administration of criminal justice than had generally been assumed' ").

[8] *Davis v. Washington* (2006), 547 U.S. 813, 833, 126 S.Ct. 2266.

[9] See *Bourjaily v. United States* (1987), 483 U.S. 171, 182, 107 S.Ct. 2775 (the Confrontation Clause must be balanced against the societal interest in accurate fact-finding); *Ohio v. Roberts* (1980), 448 U.S. 56, 64, 100 S.Ct. 2531 (where the Supreme Court, in explaining the circumstances where the Confrontation Clause might need to give way to some extent, stated that "significantly, every jurisdiction has a strong interest in effective law enforcement"); see also *Rogers v. State* (2010), 40 So.2d 888 (a trial court's finding that the state's prosecution could not have gone forward without some acceptable procedure other than face-to-face confrontation was sufficient to permit a police officer to testify by satellite from China); *Wrotten*, 14 N.Y.3d, at 40 (New York Court of Appeals held that an elderly witness's two-way televised testimony did not violate the defendant's right to confrontation where the witness was too ill to travel, and where any impairment of the defendant's confrontation right was minimal).

examination before the jury, Johnson, defense counsel, and the court. The jury was able to assess these witnesses' demeanors while they testified, and Johnson and his counsel were able to weigh the impact of their testimony on the jury as counsel crafted her cross-examination.[10]

**{¶65}** Johnson's argument that the two-way closed-circuit television procedure precluded him from effectively cross-examining Leaks is not supported by a full review of his testimony. Although Leaks initially indicated that he could not see the aerial view of the crime scene that defense counsel was showing him, he later stated, after some adjustments had been made, that he had no difficulty viewing this exhibit. And while Leaks later stated during his testimony that he was having difficulty seeing the same exhibit, our review of the transcript reveals that Leaks's statement was made more out of frustration with defense counsel's repeated questioning about his location during the shooting than from his inability to see the exhibit. The record further reveals that Higgins was shown the same aerial view of the crime scene during cross-examination and that he had no difficulty seeing the exhibit.

**{¶66}** We therefore hold that under the unique circumstances of this case, it was within the court's power to use the procedure based upon the information relayed by the assistant prosecuting attorney in the extensive in-chambers discussions, the sidebar conferences, and the trial court's own observations of witness intimidation during the trial.[11] The court's actions were the equivalent of an evidentiary hearing.

**{¶67}** Moreover, the record reflects that all the discussions regarding the video procedure occurred in chambers or in open court outside the hearing of the jury and that the trial court carefully considered and weighed the state's motion. The court's

---

[10] See *Abu Ali*, 528 F.3d at 242 (where the Fourth Circuit noted that two-way video testimony is actually more protective of a defendant's confrontation rights than the one-way video testimony approved by the Supreme Court in *Craig.*).

[11] See, e.g., *In re Howard* (1997), 119 Ohio App.3d 33, 40-41, 694 N.E.2d 488.

comments well demonstrated its intent to ensure that Johnson received a trial that not only was public, but was fair. The trial court's efforts to preserve those rights by use of two-way televised testimony should not be lightly discounted where the threat to both of these constitutional interests stemmed directly from the efforts of the defendant's friends and family to undermine the administration of justice.[12] Based upon the foregoing, we cannot conclude that James's, Leaks's, and Higgins's testimony by two-way closed-circuit television violated Johnson's Sixth Amendment right to confrontation.

{¶68} Having determined that the two-way video procedure did not violate Johnson's Sixth Amendment right to confrontation, we must next determine whether the two-way video procedure violated his right to confrontation as guaranteed by Section 10, Article I of the Ohio Constitution. The Ohio Supreme Court has determined that "Section 10, Article I provides no greater right of confrontation than the Sixth Amendment."[13] Because we have concluded that the use of the two-way video procedure did not violate Johnson's Sixth Amendment right to confrontation, we likewise conclude that it did not violate Johnson's right to confrontation under Section 10, Article I of the Ohio Constitution. We therefore overrule his second assignment of error.

### V. Manifest Weight of the Evidence

{¶69} In his third assignment of error, Johnson argues that his convictions were against the manifest weight of the evidence because numerous inconsistencies existed in James's, Leaks's, and Higgins's testimony, because Higgins's and Leak's testimony was procured by way of a plea bargain, and because Johnson offered credible alibi testimony that he had not been present at the time of the shooting.

---

[12] See Goldschneider, 15 Geo.Mason U.Civ.Rights L.J. at 47-48 (noting that when witnesses are threatened in the halls of the courthouse or while testifying, the menacing persons have already seen the witnesses, and the trial court's closure of the courtroom is likely moot).

[13] *State v. Self* (1990), 56 Ohio St.3d 73, 79, 564 N.E.2d 446 (the Ohio Supreme Court upheld an Ohio statute that permitted the use of a child sexual abuse victim's videotaped deposition).

{¶70}   When reviewing a defendant's claim that his convictions are against the manifest weight of the evidence, this court must review the record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created a manifest miscarriage of justice in finding the defendant guilty.[14]  We may grant a new trial only in the exceptional case where the evidence weighs heavily against the conviction.[15]

{¶71}   Here, the jury was presented with varying accounts of what had happened in the early morning hours of July 8, 2007.  Although the state had no physical evidence linking Johnson to the shooting, it presented eyewitness testimony that Johnson had pulled out a weapon and fired multiple shots at Moorman.  While David James testified at trial that he did not see who had shot at Moorman's vehicle, the state impeached James with his prior statements to police in which he had identified Johnson and Higgins as the individuals who had shot at Moorman's truck.  Kenneth Leaks likewise testified that he had been outside near Johnson and Higgins when he had seen the two men pull out their weapons and fire multiple shots at Moorman's vehicle.

{¶72}   Similarly, codefendant Leal Higgins testified that he was with Johnson on the night of the shooting.  He testified that when Moorman almost struck him with his vehicle, he pulled out his gun, a .40-caliber Glock and started shooting at the back of the vehicle while standing next to some cars.  Johnson had then pulled out a .45-caliber handgun and started shooting at the driver's side window of Moorman's vehicle.

---

[14] *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus; see also *State v. Thompkins* (1997), Ohio St.3d 380, 386-387, 1997-Ohio-52, 678 N.E.2d 541.

[15] *Jenks*, 61 Ohio St.3d 259, citing *Tibbs v. Florida* (1982), 457 U.S. 31, 42, 102 S.Ct. 2211.

{¶73} The record reflects that defense counsel cross-examined Leaks and Higgins extensively about the inconsistencies in their prior statements to police and in their testimony on direct examination. Defense counsel additionally highlighted these inconsistencies in her closing argument to the jury, as well as the inconsistencies between James's prior statement to police and his trial testimony. Defense counsel also pointed out that Leaks and Higgins had made deals with the state in exchange for their testimony and that they both had a motive to testify against Johnson.

{¶74} Moreover, as the state points out, the eyewitness testimony of Leaks and Higgins was also corroborated by other evidence in the case. Police officer Sandy Hanes testified that she had recovered Higgins's .40-caliber Glock pistol from exactly where Higgins had claimed it would be–in the apartment of Chanel Bassett. The deputy coroner testified that Moorman had been killed by a .45-caliber bullet that had gone through the driver's side window frame of the truck. A .45-caliber bullet was also recovered from the back of the driver's headrest in the vehicle. Moreover, police recovered two sets of shell casings—five .45-caliber shell casings and two .40-caliber shell casings—from the area around a group of parked vehicles in the street where the state's eyewitnesses had claimed Johnson and Higgins had been standing. Ballistics testing additionally confirmed that the .40-caliber shell casings had been fired from Higgins's gun.

{¶75} While testimony from Johnson's grandmother, his mother, his aunt, and three teenage girls from the neighborhood that Johnson had not been present at the time of the shooting could have created reasonable doubts in the minds of the jurors, the jury was charged with the task of deciding the credibility of these witnesses.[16] The jury clearly found the testimony of the state's eyewitnesses, who placed Johnson at the scene shooting a .45-caliber weapon at Moorman, to be more credible than the testimony of Johnson's alibi

---

[16] See *State v. DeHass* (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus.

witnesses. Based upon our review of the record, we cannot conclude that the jury lost its way in choosing to afford more weight to the testimony of the state's witnesses than to the testimony of Johnson's witnesses. Because the jury's verdict was not against the manifest weight of the evidence, we overrule Johnson's third assignment of error.

### VI. Allied Offenses of Similar Import

{¶76} In his first assignment of error, Johnson argues that the trial court erred in imposing separate sentences for the felony murder and felonious assault of Moorman because they were allied offenses of similar import under R.C. 2941.25. We agree.

{¶77} Under R.C. 2941.25, a trial court, in a single proceeding, may convict and sentence a defendant for two or more offenses " ' having as their genesis the same criminal conduct or transaction,' " if the offenses (1) are not allied offenses of similar import, (2) were committed separately, or (3) were committed with a separate animus as to each offense.[17]

{¶78} In *State v. Johnson*, the Ohio Supreme Court held, "When determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered. (*State v. Rance* (1999), 85 Ohio St.3d 632, 710 N.E.2d 699, overruled.)"[18] While all seven justices concurred in the syllabus overruling *Rance*, they could not reach a majority opinion with regard to the analysis that courts should employ in determining whether two or more offenses are allied offenses of similar import under R.C. 2941.25(A).[19] The justices did, however, uniformly agree that the

---

[17] See *State v. Bickerstaff* (1984), 10 Ohio St.3d 62, 65-66, 461 N.E.2d 892, quoting *State v. Moss* (1982), 69 Ohio St.2d 515, 519, 433 N.E.2d 181; see also *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, at ¶ 51.

[18] *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, syllabus.

[19] Id. at ¶ 47-52 (Brown, C.J., Pfeifer, J., and Lundberg Stratton, J., concurring); id. at ¶ 59-71 (O'Connor, J., Lanzinger, J., and Cupp, J., concurring in judgment only); id. at ¶ 72-83 (O'Donnell, J., concurring).

conduct of the accused must be considered.[20]   Consequently, if the evidence adduced at trial reveals that the state relied upon the same conduct to support the two offenses and that the offenses were committed neither separately nor with a separate animus as to each, then the defendant is afforded the protection of R.C. 2941.25, and the trial court errs in imposing separate sentences for the offenses.[21]

{¶79}   In this case, a jury found Johnson guilty of felony murder, under R.C. 2903.02(B), for causing the death of Moorman as a result of committing felonious assault under R.C. 2903.11(A)(1).   The jury also found Johnson guilty of a separate count of felonious assault under R.C. 2903.11(A)(1) for causing or attempting to cause physical harm to Moorman.   In comparing the elements of Johnson's offenses in the factual context in which they arose, we conclude that Johnson committed the felony murder and felonious assault of Moorman with the same conduct.   Here, testimony from the state's witnesses at trial revealed that the same shots Johnson fired at Moorman's vehicle with the purpose to cause him physical harm also resulted in his death.   As a result, the two offenses were allied offenses of similar import.

{¶80}   Having determined that the two offenses were allied offenses of similar import, we must now consider, pursuant to R.C. 2941.25(B), whether the offenses were committed with a single animus or as part of a single course of conduct.   Here, Johnson pulled out a gun and fired multiple shots in rapid succession at Moorman.   Johnson's motive was the same and was exhibited in a continuous sequence intended to inflict serious injury upon Moorman.   This single course of conduct embodied both offenses.[22]   Because the

---

[20] See id. at ¶ 44; see also ¶ 68 (O'Connor, J., concurring); see also ¶ 78 (O'Donnell, J., concurring); see also *State v. Hopkins*, 10th Dist. No. 10AP-11, 2011-Ohio-1591, at ¶ 5.

[21] R.C. 2941.25(B); *Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, at ¶ 49 and 51; see also *State v. Evans*, 1st Dist. No. C-100028, 2011-Ohio-2356, at ¶ 6-7; *State v. Mackey*, 1st Dist. Nos. C-100311, C-100312, C-100313, and C-100314, 2011-Ohio-2529, at ¶ 15-16.

[22] See *Evans*, 2011-Ohio-2356, at ¶ 11; see also *State v. Jackson*, 1st Dist. No. C-090414, 2010-Ohio-4312, at ¶ 25, citing *State v. Gandy*, 1st Dist. No. C-070152, 2010-Ohio-2873, at ¶ 11.

felony murder and felonious assault involving Moorman were allied offenses of similar import, committed in a single course of conduct with a single animus, Johnson was entitled to the protection of R.C. 2941.25. Accordingly, the trial court erred in sentencing him for both offenses. We therefore sustain Johnson's first assignment of error, vacate his sentences for the felony murder and felonious assault of Moorman, and remand this cause for the imposition of a single sentence for only one of those two offenses. We affirm the trial court's judgment and sentences in all other respects.

Judgment accordingly.

**HILDEBRANDT, P.J.,** and **HENDON, J.,** concur.