[Cite as *State v. Howard*, 2020-Ohio-3819.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

|  |  |  |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee/Cross-Appellant | : | Appellate Case No. 28314 |
| | : | |
| | : | Trial Court Case No. 2018-CR-434 |
| v. | : | |
| | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| JAMICHAEL L. HOWARD | : | |
| | : | |
| Defendant-Appellant/Cross-Appellee | | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 24th day of July, 2020.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by HEATHER N. KETTER, Atty. Reg. No. 0084470, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee/Cross-Appellant

JON PAUL RION, Atty. Reg. No. 0067020 & CATHERINE H. BREAULT, Atty. Reg. No. 0098433, 130 West Second Street, Suite 2150, P.O. Box 10126, Dayton, Ohio 45402
      Attorneys for Defendant-Appellant/Cross-Appellee

. . . . . . . . . . . . .

FROELICH, J.

{¶ 1} Following a six-day trial, a Montgomery County jury found Jamichael L. Howard ("Howard") guilty of two unclassified felony counts of murder (proximate result) in violation of R.C. 2903.02(B); two second-degree felony counts of felonious assault (serious physical harm) in violation of R.C. 2903.11(A)(1); two second-degree felony counts of felonious assault (deadly weapon) in violation of R.C. 2903.11(A)(2); and two first-degree felony counts of discharge of a firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3)(c)(4). Each of the murder and felonious assault offenses carried three- and five-year firearm specifications, and each of the remaining counts carried a three-year firearm specification. The charges stemmed from the fatal shooting of Darius Hall and the non-fatal shooting of David Coleman inside a vehicle traveling on Gettysburg Avenue. The trial court merged certain offenses and specifications, and it sentenced Howard to an aggregate prison term of 31 years to life.

{¶ 2} Howard appeals from the judgment of conviction, and the State has filed a cross-appeal as to a sentencing issue involving the merger of firearm specifications. The judgment of the trial court will be affirmed in part and reversed in part, and this matter will be remanded for re-sentencing to impose an additional three-year firearm specification.

### Factual and Procedural Background

{¶ 3} On January 22, 2018, friends of Charles Rayme were celebrating his birthday through an extended party that began in the early afternoon at the Western Manor Apartments in Dayton, known familiarly as "the Coast." Howard's younger half-brother, Michael Howard ("Michael"), lived on the third floor of building 1812 at the Coast. According to the testimony presented at trial, at some point in the late afternoon on that

date, Howard, Michael, and some others in attendance left the Coast to continue partying with Rayme at other locations. While they were gone, Michael received a message informing him that his apartment door at the Coast had been kicked in. At about 8 p.m. on January 22, Michael called the property manager, Kelly Manson, to report the incident and that his door would not shut. He also asked Manson to review the surveillance video. Manson told Michael that someone would come by during business hours to secure his apartment door. Michael did not report the incident to the police.

{¶ 4} Wanisha Smith lived in building 1812 at the Coast, directly across the hall from Michael's apartment. Smith testified that on the evening of January 22, 2018, she answered a knock at her door to find a group of men with guns who were looking for Darius Hall, Smith's boyfriend, who frequently stayed there. The men claimed that Hall had broken into Michael's apartment. Smith knew Michael and Howard from her time living at the Coast and recognized them as two of the people at her door. Smith was particularly frightened by Howard because he was carrying "a big gun" and he sounded angry. (Trial Tr., p. 385-386.)

{¶ 5} Howard directed Smith to call Hall, but due to the circumstances, Smith only pretended to do so, instead dialing a number that she knew Hall would not answer. After the group including Howard and Michael left, Smith actually, but unsuccessfully, attempted to reach Hall by telephone at 8:50 p.m., leaving him a message. Smith then called Dominque Parks and Pennie Williams, two friends who also lived at the Coast, to ask if they knew where Hall was. Minutes later, a group of women came to Smith's door and accused her of knowing something about the break-in at Michael's apartment. After the women departed, Smith left her apartment and went to an apartment below hers

because she was afraid.

{¶ 6} Shortly thereafter, Smith saw David Coleman, a friend of Hall's, pull into the Coast's parking lot in his gray Dodge Charger and hurry toward Smith's building; Smith said she assumed that Parks and Williams had relayed information about the incident to Coleman in attempting to reach Hall. Coleman stayed with Smith until Hall pulled up five to ten minutes later and directed them to go to Williams's apartment. Williams, Parks, Smith, Hall, Coleman, another friend, and Williams's young son then waited together inside Williams's second-floor apartment in building 1808 at the Coast. After some time, Coleman went outside to leave, but soon returned, saying he had "a bad feeling." (*Id.*, p. 395.) After another 30 minutes, Coleman again got up to leave, summoning Hall to accompany him; Hall did so, but told Smith to stay.

{¶ 7} At alternating times, Smith, Williams, and Parks each looked out the back window of Williams's apartment as Coleman and Hall walked down the sidewalk toward a group that Smith said she recognized as including Howard and Michael. Williams testified that she did not recognize anyone in the group outside, but she heard yelling and heard Hall say, "I didn't do it." (Trial Tr., p. 516.) Parks testified to seeing "a whole bunch of cars" in the parking lot at the Coast on the night of January 22 (*id.*, p. 540), and to seeing Howard among the group of men gathered there, "standing in the doorway" to the driver's side of a two-toned Dodge Magnum. (*Id.*, p. 545.) Parks described the scene when Hall and Coleman went outside as a "standoff"; he said people were yelling and "it just looked like something [wa]s going to happen." (*Id.*, p. 546.)

{¶ 8} Smith testified that she could not hear what was being said outside, but she could see gesturing, and "they all had guns, everybody," including Hall and Coleman. (*Id.*,

p. 398-399.) After the confrontation, Smith saw Coleman get into the driver's seat and Hall into the passenger's\] seat of Coleman's Dodge Charger, and they drove off. Immediately thereafter, the others gathered in the parking lot entered their cars and also left. According to Smith, Howard's two-toned Dodge Magnum was directly behind Coleman's car, followed by other vehicles, but she could not see who was driving any of those cars. Soon after the vehicles left the parking lot, Smith heard gunfire. Hall failed to answer her subsequent successive phone calls, which Hall's phone log showed as beginning at 2 a.m. on January 23, 2018.

{¶ 9} Testifying remotely from Las Vegas, Coleman related a similar version of that night's events. He said that he arrived at the Coast at about 10:40 p.m. on January 22, 2018, after finishing his work shift. As he approached Smith's building, Smith stopped him and told him that people had come to her apartment looking for Hall. When Hall arrived, they all gathered in Williams's apartment, where they played video games and drank alcohol. Coleman said he stepped outside for a phone conversation with his fiancé and noticed "[a] lot of cars just started pulling in." (Trial Tr., p. 599.) He recognized a gray and black Dodge Magnum as a car he had seen before at the Coast, with Howard (whom Coleman did not know by name at that time) inside. When Coleman heard one the men standing with the cars ask, "was that him[?]," he returned inside to tell Hall. (*Id.*) Hall told Coleman he (Hall) had learned the men outside wanted to talk to him, so Coleman accompanied Hall outside, because "I wasn't going to leave him (Hall) hanging," to possibly be harmed. (*Id.*, p. 601.)

{¶ 10} Coleman testified that he and Hall encountered a group of eight to ten men waiting outside. A man Coleman did not know was accusing Hall of breaking into his

apartment, and Hall denied doing so. Coleman recognized Howard in the group. Coleman described the situation as "tense," with the accuser and Hall continuing to exchange words and many people displaying guns; Coleman said he had his own gun in his pocket. Coleman then got into the driver's seat of his Dodge Charger, Hall got into the passenger seat, and they pulled out of the parking lot to head to a nearby gas station on Gettysburg Avenue to buy cigars. Coleman said Hall was insisting that the men from the parking lot were going to follow them, then said they were following. Coleman looked back and saw a line of cars from the Coast parking lot behind him, with the Dodge Magnum being the closest. Coleman said that the distraction caused him to miss the turn into the gas station. He testified that he told Hall to recline his seat and lower his window so that Coleman could fire his gun if necessary.

{¶ 11} According to Coleman, the glass in his rear passenger window then shattered, after which he felt his body "tingling" and he lost control of his legs. (*Id.*, p. 608.) Coleman noticed that Hall was unresponsive and that there was blood on the back of Hall's seat. As the Dodge Magnum pulled along the passenger side of Coleman's car, Coleman emptied his weapon – a Kahr 9mm – in that direction. After gradually steering the car to a stop due to his inability to apply the brakes, Coleman called 911. In the recording of that call played for the jury, Coleman said that he had been shot by a black male in a gray and black Magnum, and that he knew the man but could not recall his name. (State's Exh. 21.)

{¶ 12} Coleman testified that he was shot once in the upper back, that the bullet could not be removed, and that he permanently lost the use of his legs as a result of his injuries. The defense stipulated that Coleman sustained serious physical harm in the

shootings.

{¶ 13} Forensic pathologist Dr. Russell Uptegrove testified that Hall died as the result of a bullet that entered his head "slightly above and slightly behind his left ear," then passed through the left parietal lobe before coming to rest in the left lobe of the cerebellum. (Trial Tr., p. 246-247.) A tiny fragment of that bullet and the main projectile were admitted into evidence as State's Exhibits 14B and 14A. Hall also sustained a gunshot wound through his left thumb and suffered some superficial facial wounds consistent with being hit by shattered glass. Dr. Uptegrove found no stippling of the entry wounds, suggesting that the bullet was fired from a distance of greater than 24 inches. The lack of medical intervention indicated to Dr. Uptegrove that Hall was pronounced dead at the scene.

{¶ 14} Rayfield Lewis, a barber, testified that Michael called him on January 22, 2018 and asked him to come to Michael's apartment at the Coast to cut his hair. Lewis arrived there in his red Ford Taurus sometime between 1:00 and 3:00 p.m. that day. Michael was with a man who was celebrating his (the other man's) birthday, and when Lewis finished cutting Michael's hair, other people had arrived and Lewis decided to hang out with the group for an hour or so. Lewis said that he recognized the others from a "bootleg," or "after hour joint," that all of them frequented. (Trial Tr., p. 436.)[1] He testified that he had someone else pick him up from the Coast at about 5:30 p.m. on January 22, but he again encountered Michael, Howard, and others from the Coast group as they were leaving the K-9 Club at about 11 p.m. that night. The group indicated that they were

---

[1] Detective Thomas Cope later explained that "boot joints" are unlicensed and illegal operations. (Trial Tr., p. 1066, 1104.)

headed to "the bootleg," and Lewis decided to join them, riding along in a green Ford Explorer with his friend "Dez."[2] According to Lewis, however, on the way to the bootleg, Michael called Dez, and Lewis overheard Michael say that he was going back to the Coast because his apartment had been broken into. The entire group then headed to the Coast.

{¶ 15} Lewis testified that as they arrived at the Coast from the K-9 Club, Michael was driving a silver Buick and Howard was driving a two-toned Dodge Magnum. Standing outside the Coast was a man wearing a black hoodie, whom Lewis did not recognize. Michael went up to his apartment and returned, wondering aloud whether security cameras had captured the break-in. As the group stood outside talking, the man in the black hoodie walked to the side of the apartment building and returned with a "[c]hubby guy," also wearing a hoodie. (*Id.*, p. 445.) Lewis indicated that a heated exchange began between Michael and the two men in hoodies, with one man denying that he broke into Michael's apartment and all of the men carrying guns in holsters or in pockets. Lewis said that Howard was carrying an assault rifle. Per Lewis's testimony, at that point the two men in hoodies left in a gray Dodge Charger, Michael said that the group was "going to the bootleg," and Howard followed the Charger out of the lot, driving his Dodge Magnum, followed by a "parade" of other vehicles, including Lewis in the green Explorer driven by Dez. (*Id.*, p. 447-448.)

{¶ 16} After the car in which he was riding turned right, Lewis heard shots and witnessed gunfire coming from both the Charger and the Magnum. He said that the Magnum "[s]witched lanes" to pull alongside the passenger side of the Charger, but he

---

[2] On cross-examination, Lewis said that he did not know Dez's last name. (Trial Tr., p. 480.) Det. Cope said he believed a "Desmond" was among the individuals apprehended at the boot joint on the morning of January 23, 2018. (Trial Tr., p. 1102, 1109-1110.)

did not see which car fired first. (*Id.*, p. 451.) Lewis said the other vehicles proceeded past the Charger on to the bootleg, where police arrived and the group scattered. According to Lewis, the Dodge Magnum "pulled up and pulled out" of the bootleg, and Howard did not appear inside the bootleg. Lewis stated he was "100 percent" certain during his police interview when he identified Howard as the driver of the Dodge Magnum that fired on the Dodge Charger. (*Id.*, p. 456-457.) At trial, he also identified Howard as one of the individuals captured on the video from the parking lot of the Coast immediately before the shootings, and the Dodge Magnum on that video as the car that Howard was driving. A police detective also testified as to Lewis's expression of complete certainty in his identification of Howard as the driver of the Dodge Magnum at the time of the shooting.

{¶ 17} Detective Sean Copley of the Dayton Police Department testified that, as part of the investigation of the January 23, 2018 shootings, he retrieved surveillance video from security cameras located at the Coast and created copies of two different parking lot views from that morning. He also collected and created copies of surveillance video from cameras at a gas station on Gettysburg Avenue and from a beauty supply store, as well as a DVR from the group's "boot joint" destination located near the beauty supply store. He explained the process by which he created a "clipped" version combining those videos into a single "movie" displaying the relevant portions in sequence. (Trial Tr., p. 289-291.) The resulting compilation (State's Exh. 15) was played for the jury and admitted into evidence. Det. Copley identified State's Exhibits 15A through 15QQQQQ as still shots of the same video images, and those exhibits also were admitted into evidence.

{¶ 18} The State also presented the testimony of James Terrell, who identified

himself as the property manager at the Coast since April 2018,[3] before which he worked in security there for eight years. Terrell testified that he knew Michael as a resident of various apartments at the Coast and also had come to know Howard through his visits to the property. He said that he knew Howard to drive a two-toned Dodge Magnum that he (Terrell) never had seen anyone else operating. Terrell said that when he previously worked security at the Whitney Young Apartments in Dayton, he also saw Howard in the same Dodge Magnum at that location.

{¶ 19} After explaining the layout of the Coast complex, Terrell testified that he reviewed surveillance video from the complex for the morning of January 23, 2018 with detectives from the Dayton Police Department. Terrell further testified that he recognized both Howard and Michael on that video. Directed to State's Exhibit 15, Terrell identified Howard's Dodge Magnum, Howard, and Michael on the video; he also identified the car and Howard on still images taken from the video.

{¶ 20} Officer Zachary Burns of the Dayton Police Department testified that he and his partner were the first to arrive at the scene on January 23, 2018, in response to a dispatch about the shootings. They found a man lying outside the driver's side of a bullet-riddled gray Dodge Charger and another man dead in the front passenger seat. The man on the ground outside was Coleman, who was conscious but unable to move. Coleman indicated to the officers who had shot him. Ofr. Burns saw a gun on the driver's seat and a firearm magazine on the driver's side floorboard, which he did not disturb. Coleman was transported to the hospital by medics, and Ofr. Burns and his partner cordoned off a large

---

[3] Terrell initially said his position changed in April 2017 (Trial Tr., p. 330), but later corrected that to April 2018. (*Id.*, p. 359.)

area with crime scene tape.

{¶ 21} Officer Stephen Cline of the Dayton Police Department testified that he was the evidence technician called to process the crime scene on January 23, 2018. Ofr. Cline described photographing a gray or silver Dodge with "a lot of bullet holes" and a dead body in the fully-reclined front passenger seat. (Trial Tr., p. 670, 672.) He identified photographs depicting bullet holes and blood on the driver's side of the Dodge, along with bloody clothing that medics apparently had cut off an injured person. He also photographed and collected an empty Kahr 9mm semiautomatic firearm found on the edge of the driver's seat and an empty magazine found on the floor in front of that seat. Photographs of the deceased depicted a bullet wound to his head and a gun in his right jacket pocket. The gun was a Ruger 9mm semiautomatic which Ofr. Cline also collected and sealed. When found, the Ruger had one round in the chamber and six bullets in the magazine. Additionally, Ofr. Cline gathered five spent casings from the backseat of the Dodge.

{¶ 22} After the Dodge Charger was towed to the police evidence garage, evidence technician Ronald Christoffers of the Dayton Police Department further processed the vehicle. Ofr. Christoffers testified that after acquiring a search warrant, he took photographs throughout the vehicle and recorded a diagram of his work. He found five bullet strikes on the back of the Charger, some of which entered the vehicle. One photo depicted a hole where a bullet passed through the trunk then through the rear passenger seat. Others depicted bullets striking, and some passing through, the rear corner panel on the passenger side, the rear passenger door, the rear passenger window, the rubber molding, the passenger side mirror, the front passenger door, and the front

grill. Another bullet entered the engine compartment. Ofr. Christoffers determined that strikes to the driver's door and window actually came from bullets that passed through the passenger side and across the vehicle's interior. He estimated that a total of 13 to 18 bullets struck the vehicle. He also found a bullet fragment in the driver's seat, and two copper jackets and a single 9mm bullet casing elsewhere in the vehicle. Based on his experience, Ofr. Christoffers opined that the copper jackets were from a rifle.

{¶ 23} Homicide Detective Melissa Schloss testified that she was assigned to return to the Gettysburg Avenue crime scene on January 26, 2018, to search the area for bullet casings. Det. Schloss said that she and another detective located 10 casings as they walked southbound along the west side of the street. They found one additional casing on the east side of the street. Det. Schloss testified that the casings including ammunition from different types of weapons. She said the detectives waited for an evidence technician to arrive to photograph and collect those casings.

{¶ 24} Officer Jeffrey Downing was the evidence technician who responded for that purpose. Ofr. Downing said he initially placed each casing in an individual evidence bag before grouping them by caliber. He identified exhibits consisting of one 9mm Luger 1 casing (State's Exh. 115A); two Blaze .40 caliber Smith and Wesson casings (State's Exh. 115B); four .223 REM (Remington) casings (State's Exh. 115C); and four 7.62 by 39 TulAmmo casings (State's Exh. 115D.) Based on his experience, Ofr. Downing testified that the REM and TulAmmo casings likely came from an assault rifle. He also disclosed that when preparing his report, he mistakenly reversed east and west in recording where the casings were found; he confirmed Det. Schloss's testimony that 10 casings were found on the west side and one on the east side of the street.

{¶ 25} Ofr. Downing testified that on the same date, he also was involved in processing the two-toned Dodge Magnum at the police evidence garage. Testifying from photographs he identified as ones he took (State's Exhs. 100-112), Ofr. Downing said he found no bullet strikes to the back, passenger side, or driver's side of that vehicle. He did locate a bullet hole in the Magnum's hood, and damage underneath from a bullet that had traveled through the hood. All windows were intact. Ofr. Downing found and collected an empty .40 caliber magazine from inside the Magnum's console. (State's Exh. 114.) He was unable to find the bullet that entered the engine compartment. Ofr. Downing testified that he also swabbed the magazine and areas of the interior of the Dodge Magnum for DNA evidence. (State's Exhs. 113A-113E.)

{¶ 26} Henry Bailey, who was the maintenance manager at the Bancroft Apartments in Dayton in January 2018, testified that on the morning of January 25, 2018, he noticed a silver and back Dodge Magnum parked in front of the dumpster in the alley at the apartments. Bailey said he and another employee there observed a bullet hole in the car's hood and a bullet casing "on the very top of the car right above the back driver's side wheel well." (Trial Tr. p. 1011.) Bailey identified photos depicting the Magnum, the bullet hole, and the casing. (State's Exhs. 94, 97, 98.) Bailey then called the police to report the car. He testified that because his employee said he believed the car may have "been there a couple days," Bailey relayed that information to the police, even though Bailey himself did not see the car until January 25. (Trial Tr., p. 1014.)

{¶ 27} Officer Christopher Savage of the Dayton Police Department testified that at about 10:45 a.m. on January 25, 2018, he responded to a dispatch about a black and silver Dodge Magnum with a bullet hole that had been abandoned in an alley. Ofr. Savage

was aware that Dayton homicide detectives were looking for a car matching that description in connection with a recent homicide. When he arrived at the alley by the Bancroft Apartments, he found the car parked next to a dumpster. Upon approaching the vehicle, he saw a bullet hole in the hood and two spent 9 mm shell casings, one in the door seam on each side of the car. Ofr. Savage testified that he called in the vehicle's license plate and learned that Malin Campbell was the registered owner. Ofr. Savage contacted Det. Thomas Cope about the vehicle, and Det. Cope responded to handle the vehicle from there.

{¶ 28} Malin Campbell testified as the registered owner of the 2005 Dodge Magnum involved in the shootings. She stated that she registered that car in her name as a favor to Howard, whom she had known for at least 11 years, but that Howard had actually purchased the car, and she had never driven it or sat in the driver's seat. She said she had seen Howard drive the car, but also had seen others drive it.

{¶ 29} Debra Moody, a Dayton resident living a few blocks from Gettysburg Avenue, testified that on April 17, 2018, she found a Smith & Wesson handgun on the ground in the alley behind her home while bringing in her trash can. Thinking the muddy object was a toy, she picked it up in her gloved hand, then immediately realized it was real. Although she was leaving to go somewhere, Moody said she called the police and told them that she was placing the gun in the recycling bin by her garage. When she returned home, the gun was gone. Only when a detective contacted Moody in October 2018 did she learn that the gun was relevant to a criminal case.

{¶ 30} Officer Daniel Hall of the Dayton Police Department testified that while on duty on April 17, 2018, he and his partner were dispatched to pick up a firearm from a

recycling bin at Moody's address. Ofr. Hall said he removed the magazine to render the weapon safe, and noticed that there were live rounds of "corroded" ammunition inside the dirty weapon. (Trial Tr., p. 1024.) He transported the weapon to the police property room, placed it in an envelope, and tagged it for storage. He identified State's Exh. 116 as that 9 mm Smith & Wesson handgun, along with the magazine and cartridges recovered with it. Ofr. Hall said the weapon was capable of holding 16 rounds in the magazine plus one in the chamber, and actually held 11 rounds when found.

{¶ 31} Detective Cope of the Dayton Police Department's homicide unit was the lead detective assigned to investigate the January 23, 2018 shootings. Det. Cope identified the Smith & Wesson handgun recovered from Moody's address. (State's Exh. 116.) He testified that ballistics testing performed on that weapon at the Miami Valley Regional Crime Lab revealed that gun to be connected to these shootings. He said he then requested that the weapon also be tested for DNA.

{¶ 32} Det. Cope described personally retrieving surveillance equipment from the Dayton "boot joint" involved in this case. He said he learned that a nearby beauty supply store also had exterior surveillance cameras, and security recordings were obtained from there as well. Det. Cope testified that the compilation video presented at trial (State's Exh. 15) was created from "at least seven hours" of video recordings acquired from 10 different surveillance cameras in different locations. (Trial Tr., p. 1076-1077, 1103.) He narrated the action depicted on that compilation video, beginning with cars arriving in the parking lot outside Smith's apartment at the Coast, the black and gray Dodge Magnum arriving last. The video continued, showing people congregating in front of those cars. Det. Cope identified photographs of Michael taken on the afternoon of January 23, 2018, wearing

the same "distinct" clothing in which a person appears on surveillance video recorded in the parking lot of the Coast that morning. (*Id.*, p. 1083); (State's Exhs. 128, 129.) Det. Cope said that Michael was wearing that clothing when he was taken into custody at the boot joint on the morning of January 23.

{¶ 33} The video continued as individuals entered their vehicles, headlights came on, and cars exited the Coast's parking lot. Det. Cope testified that the first vehicle departed at 1:42 a.m. on January 23, with the Dodge Magnum about 30 seconds behind. Video from the gas station on Gettysburg Avenue then showed a silver Charger followed by the two-toned Dodge Magnum and a series of SUVs and sedans. The recording from those cameras stopped when the cars reached a point on Gettysburg Avenue that Det. Cope said was "right before where the mass of * * * shell casings were found" on the street after the shooting. (Trial Tr., p. 1090.) The cars were signaling a right turn.

{¶ 34} From there, the video turns to the vantage point of the beauty supply store cameras, showing the Magnum driving southbound on Gettysburg. When further video shows the other SUVs and sedans entering the alley where the rear entrance to the boot joint is located, the Magnum no longer can be seen. Det. Cope testified that the Magnum does not appear in any video recorded thereafter. As multiple police cruisers are seen arriving at the boot joint, people can be seen running, including running through a yard on the street where Moody lived. Det. Cope said five of those individuals were apprehended; Howard was not among them.

{¶ 35} Det. Cope testified that on January 25, 2018, Ofr. Savage notified him that Savage had located the Dodge Magnum seen in the surveillance videos. Det. Cope and Det. Rod Roberts then went to the Bancroft Apartments to secure that vehicle. Det. Cope

collected one shell casing that was stuck upright in the "drip rail" or gutter on top of the driver's side of the Magnum's exterior, and another flush with the drip rail on the passenger side. (Trial Tr., p. 1069-1070); (State's Exh. 99.) Det. Cope said he requested that DNA testing be performed on the shell casings, and that they also be compared to other ballistic evidence in the case.

{¶ 36} Firearms examiner Dena Inempolidis of the Miami Valley Regional Crime Lab testified as a firearms expert. After explaining how the unique markings a firearm leaves on cartridge cases and bullets allow spent cartridges and bullets to be matched to a particular firearm, Inempolidis testified that the bullet recovered from Hall's body (State's Exh. 14A)[4] was 9mm or .38 caliber, based on its size and markings. She said that she eliminated both Coleman's Kahr 9mm semiautomatic (State's Exh. 37) and the Ruger 9mm semiautomatic recovered from Hall's pocket (State's Exh. 36) as the source of that bullet, due to "different class characteristics." (Trial Tr., p. 897-898.) Inempolidis said comparisons were "inconclusive" as to whether the Smith & Wesson 9mm handgun found in the alley behind Debra Moody's home in April 2018 (State's Exh. 116) could have been the source of that bullet. (Trial Tr., p. 898.)

{¶ 37} Inempolidis also testified that the bullet fragment (State's Exh. 92A) and bullet jacket fragments (State's Exhs. 92B, 92C) recovered from inside Coleman's Charger were "consistent with being of a .22 class caliber." (Trial Tr., p. 900.) Although she was not presented with a .22 caliber firearm to which to compare those exhibits, she concluded that Exhibits 92A and 92C had been fired from the same weapon; the result

---

[4] Inempolidis said that the smaller piece of shrapnel found on Hall's body (State's Exh. 14B) contained no markings that could be used for purposes of comparison.

was inconclusive as to Exhibit 92B. As to the five casings recovered during the initial processing of Coleman's Dodge Charger (State's Exh. 39) and the additional casing located there during further processing at the police evidence garage (State's Exh. 92D), Inempolidis testified that Coleman's Kahr 9mm semiautomatic (State's Exh. 37) was a match for all six. However, she said that the two 9mm casings recovered from the top of the Dodge Magnum (State's Exh. 99A, 99B) as well as the 9mm Luger 1 casing found along Gettysburg Avenue on January 26, 2018 (State's Exh. 115A) were not fired by the Kahr 9 mm. Instead, she said that State's Exhibit 115A was determined to match the Smith & Wesson 9mm. (State's Exh. 116.)

{¶ 38} With regard to the remaining spent 9mm ammunition matched to neither the Kahr 9mm nor the Smith & Wesson 9mm (i.e., State's Exhs. 99A, 99B), Inempolidis concluded that neither had been fired by the Ruger 9mm semiautomatic recovered from Hall's body. (State's Exh. 36.) She further concluded that those two casings had been fired from two different weapons. Inempolidis also concluded that the two Blaze .40 caliber Smith and Wesson casings recovered along Gettysburg Avenue (State's Exh. 115B) were fired from the same firearm, as were the four 7.62 by 39 TulAmmo casings found there (State's Exh. 115D), but she could reach no conclusion regarding whether the four .223 REM casings found along Gettysburg Avenue (State's Exh. 115C) also were fired from a single gun.

{¶ 39} Inempolidis testified that both 7.62 ammunition and .223 ammunition typically would be fired from a rifle or "long gun," but she was aware of "firearms * * * that are legally considered a pistol that will fire a .223." (Trial Tr., p. 918.) She also stated that .22 caliber ammunition such as that represented by the bullet fragments in State's Exhibit

92 could be associated with either a handgun or a long gun. According to Inempolidis, an assault rifle typically would use 7.62 ammunition.

{¶ 40} Amy Dallaire, a forensic scientist in the serology/DNA section of the Miami Valley Crime Lab, also testified as an expert witness for the State. She testified that she tested swabs taken from various items of evidence and compared the results to known DNA standards for Howard and Michael. Dallaire stated that she was unable to obtain a DNA profile from the Smith & Wesson firearm recovered from behind Moody's house. (State's Exh. 116.) Her testing of the bullet casings recovered from the top of the Dodge Magnum (State's Exh. 99) yielded "a partial mixed profile." (Trial Tr., p. 977.) Both Howard and Michael were excluded as having contributed to that DNA profile. The tests Dallaire performed on swabs taken from a .40 caliber magazine (State's Exh. 113E) and from the front passenger side of the Dodge Magnum (State's Exh. 113B) also revealed mixed partial profiles to which neither Howard nor Michael contributed. Swabs from the rear passenger side of the Magnum's interior (State's Exh. 113D) contained "a single source male profile" (Trial Tr., p. 982), but again Howard and Michael were eliminated as the source of that DNA. Testing of swabs from the rear driver's side interior (State's Exh. 113C) showed another mixed partial profile from which Michael could be excluded; the results were inconclusive as to Howard. Finally, Dallaire testified that she tested swabs taken from the front driver's seat area of the Dodge Magnum (State's Exh. 113A) and determined that Michael could, but Howard could not, be excluded as having contributed to the mixed partial DNA profile obtained from "at least three individuals." (Trial Tr., p. 992.) Dallaire opined that one in 81 people other than Howard "could also be another possible contributor to this mixed DNA profile." (Id., p. 993.)

{¶ 41} The trial court denied the defense motion for dismissal pursuant to Crim.R. 29 made at the end of the State's case. The defense then called a single witness, Ray Vaughn Chappel, who identified himself as Howard's older brother through the same mother.[5] Chappel testified that he was at the Coast beginning at midday on January 22, 2018, to join in Rayme's birthday celebration. He said that people moved between Michael's apartment and the parking lot, and Chappel saw that his brother, Howard, was also there that day. At some point a group that included Chappel, Howard, and Michael left the Coast to go to the Whitney Young Apartments, then on to the K-9 Club. While they were out, Chappel overheard a call to Michael from a woman who said that Michael's apartment had been broken into. The group immediately returned to the Coast, with Chappel driving "a red Impala or Malibu" that he had borrowed from his girlfriend's brother. (Trial Tr., p. 1123.)

{¶ 42} Chappel said Howard was with the group that returned to the Coast, but he denied knowing how Howard got there. He then said that "a female" was driving the Dodge Magnum and Howard "was riding with her that day. He never drove." (*Id.*, p. 1124.) Chappel identified a photograph of the Magnum and said that he had seen "[m]ultiple people driving it" in the past. (*Id.*) He said he last saw that car on January 22 at the K-9 Club.

{¶ 43} According to Chappel, after determining that Michael's apartment had been "ransacked," Chappel, Michael, and "a couple others" crossed the hall to Smith's apartment to ask if she had heard anything. (*Id.*, p. 1125-1126, 1128.) When Smith said

---

[5] Because Howard and Michael share the same father, Chappel is not related to Michael. (Trial Tr., p. 1135.)

she had not, the group asked her where Hall was. Chappel said that after Smith gave them a wrong number for reaching Hall, a group of 10 to 15 that included Howard stood in the parking lot for 20 to 30 minutes. Chappel said the Dodge Magnum also was in the parking lot at that time.

{¶ 44} Chappel said he and others then returned to the Whitney Young Apartments before going to the K-9 Club. Afterward, they returned to the Coast, where he saw Michael but not Howard. The group stood in the parking lot for about 30 minutes before Chappel saw two people in hoodies approach. Chappel testified that Michael and another man talked to the men in hoodies, but there "was no type of problems, no escalation of anger." (*Id.*, p. 1131.) Rather, he said the group just decided to "go to the boot leg." (*Id.*) Chappel saw Hall leave in a silver Charger, and did not know the order of the nine or 10 cars that followed, but they included Michael in a silver Buick and Chappel at the end, driving the red Impala. Chappel said that Howard was not among them. Chappel testified that as they turned onto Gettysburg Avenue, he heard shooting, and "[e]verybody took off." He continued to the boot leg, where he saw Michael.

{¶ 45} On cross-examination, Chappel acknowledged that Howard was known to drive the two-toned Dodge Magnum, but he denied that Howard was among the group who confronted Smith about the break-in at Michael's. He also denied that Michael confronted Hall, or that the two men had been yelling in the Coast's parking lot. After watching the video of a police interview he gave on January 30, 2018, however, Chappel agreed that during that interview, he told police that Michael and Hall had yelled at each other before the shootings, and he also identified Howard as being in the Coast's parking lot before the shooting, getting into the passenger seat of the Dodge Magnum.

{¶ 46} On January 11, 2019, the jury returned a verdict of guilty as to all counts and specifications. Howard appeared for sentencing on February 13, 2019. (Trial Tr., p. 1256-1266.) At the sentencing hearing, the trial court merged all of the three-year and all of the five-year firearm specifications. The court also merged the Count II murder offense into the Count I murder offense; merged the Count III and Count IV felonious assault offenses concerning Hall into the Count I murder offense; and merged the Count VI felonious assault offense into the Count V felonious assault offense, both of which concerned Coleman. The trial court found that the Count VII and Count VIII offenses of discharging a firearm over a roadway did not merge because they involved separate victims and separate animus.

{¶ 47} The court then proceeded to sentence Howard to 15 years to life on the Count I murder offense, plus a three-year and a five-year firearm specification to run consecutively to each other and prior and consecutively to the murder sentence. As to the Count V felonious assault, the court sentenced Howard to eight years, to run consecutively to the Count I sentence. On each of the Count VII and Count VIII discharging a weapon offenses, the court imposed a sentence of eight years, to run concurrently with Counts I and V.[6] On February 15, 2019, the trial court entered a written judgment consistent with the above and stating the additional terms governing Howard's convictions and sentence.

{¶ 48} In appealing from that judgment, Howard sets forth four assignments of

---

[6] In the same proceeding, the trial court also sentenced Howard on his guilty plea in Montgomery C.P. No. 13-CR-3861, and ordered that the 18-month sentence for that offense be served concurrently with the sentences in Howard's 2018 case. This appeal does not implicate the sentence in the 2013 case.

error:

1) It was reversible error in violation of the Sixth Amendment's Confrontation Clause to allow David Coleman to testify remotely.

2) The evidence was insufficient [sic] as a matter of law and/or against the manifest weight of the evidence to sustain [Howard's] conviction.

3) [Howard] was denied effective assistance of counsel in violation of his constitutional rights thus prejudicing his right to a fair trial.

4) The cumulative effect of counsel's errors denied [Howard] a fair trial and rendered trial counsel's assistance ineffective.

{¶ 49} The State's cross-appeal raises this single assignment of error: "The trial court erred in merging all of the three-year firearm specifications."

**Howard's Assignment of Error #1 – Confrontation Clause Violation**

{¶ 50} Howard contends that his Sixth Amendment right to confront the witnesses against him was violated when the trial court permitted David Coleman, a key prosecution witness, to testify via a two-way closed-circuit television system rather than by personally appearing in the courtroom. Howard argues that the State demonstrated neither justification for nor the reliability of Coleman's remote testimony.

{¶ 51} The Sixth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, affords criminal defendants the right "to be confronted with the witnesses against [the]m." *Maryland v. Craig*, 497 U.S. 836, 844, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). While "face-to-face confrontation forms 'the core of the values furthered by the Confrontation Clause,' " (citation omitted.) *id.* at 847, "the face-

to-face confrontation requirement is not absolute." *Id.* at 850. [7]    Rather, " 'the Confrontation Clause reflects a *preference* for face-to-face confrontation at trial[ ]' * * * that 'must occasionally give way to considerations of public policy and the necessities of the case[.]' " (Citations omitted.) (Emphasis sic.) *Id.* at 849. Accordingly, the Supreme Court held in *Craig* that "if the State makes an adequate showing of necessity, the state interest in protecting child witnesses from the trauma of testifying in a child abuse case is sufficiently important to justify the use of a special procedure that permits a child witness in such cases to testify at trial against a defendant in the absence of face-to-face confrontation with the defendant." *Id.* at 855. "The requisite finding of necessity must of course be a case-specific one," based on evidence presented to the trial court. *Id.*

{¶ 52} Appellate courts in Ohio have expanded on *Craig,* permitting the use of remote testimony from witnesses other than child victims of sexual abuse. *See, e.g., State v. Johnson*, 195 Ohio App.3d 59, 2011-Ohio-3143, 958 N.E.2d 977 (1st Dist.); *State v. Marcinick*, 8th Dist. Cuyahoga No. 89736, 2008-Ohio-3553. In *Johnson,* the trial court granted the State's motion to permit three adult prosecution witnesses in a murder trial to testify by two-way closed-circuit television, based on evidence that the defendant's family and friends had attempted to intimidate those witnesses to dissuade them from testifying. *Id.* at ¶ 18-33. The First District Court of Appeals observed that "multiple state and federal courts have read *Craig's* references to 'an important public policy' and 'an important state interest' as suggesting a general rule that is not limited to protecting child victims of sexual

---

[7]  *Accord Ohio Assn. of Pub. School Emps. v. Lakewood City School Dist.*, 68 Ohio St.3d 175, 179, 624 N.E.2d 1043 (1994) ("Even in criminal law, the right to confrontation is not absolute.").

offenses from the trauma of testifying in a defendant's presence." *Id.* at ¶ 61. In *Johnson*, the appellate court determined that the trial court's use of two-way closed-circuit television to present the adult witnesses' testimony was "necessary to further the public policy of justly resolving the criminal case, while at the same time protecting the well-being of the state's witnesses," and also "preserved the reliability of th[o]se witnesses' testimony." *Id.* at ¶ 63-64.

{¶ 53} In *Marcinick*, the appellate court determined that the use of a live video link to allow a key prosecution witness to testify from Belgium did not violate the defendant's confrontation right. *Marcinick* at ¶ 22. The court set forth the following test for determining whether an alternative to face-to-face confrontation qualifies as an exception to the Confrontation Clause:

> the procedure must (1) be justified, on a case-specific finding, based on important state interests, public policies, or necessities of the case and (2) must satisfy the other three elements of confrontation – oath, cross-examination, and observation of the witness's demeanor.

*Id.* at ¶ 18, citing *Craig.* at 849-851.

{¶ 54} The court in *Marcinick* reasoned that the State had "demonstrated the unavailability of the witness and the admissibility of the testimony," and that "[t]he live two-way link preserved the reliability elements of confrontation: the witness testified under oath; was subject to cross-examination; and, the trial court and [the defendant] could observe the witness' demeanor while testifying." *Id.* The court thus determined that the trial court did not err by admitting the remote testimony. *Id.*

{¶ 55} We reach the same conclusion in this case. Prior to trial, the State

presented evidence that Coleman, the surviving victim of the crimes with which Howard was charged, is confined to a wheelchair after being left paralyzed from the waist down by the bullet that struck him in the back. (*See* Tr. of 12/20/18 Status Conference.) Coleman's appearance as a witness during Howard's trial unquestionably would "further the public policy of justly resolving the criminal case," satisfying that aspect of the "justified" analysis. *See Johnson*, 195 Ohio App.3d 59, 2011-Ohio-3143, 958 N.E.2d 977, at ¶ 63. His remote appearance also served the State's interest in protecting Coleman's well-being. *See id.* That same protective interest implicates the "necessity" element.

{¶ 56} During the December 2018 status conference, Coleman testified via video-conference from Las Vegas, Nevada that he moved there from Dayton in February 2018. (Tr. of Status Conference., p. 11.) He stated that he suffered from multiple medical conditions that impeded his ability to travel – i.e., "chronic back pain, spasm, overactive bladder, cardiologist, * * * neurology, urology, wound care." (*Id.*, p. 12.) Coleman testified that "[t]oo many [times a day] to count," he experienced muscle spasms that "make[ ] me feel like I'm suffocating." (*Id.*, p. 13.) He also had to catheterize himself every four hours to prevent kidney infections. (*Id.*, p. 14.) Coleman said that a cardiologist recently diagnosed him with an irregular heartbeat that caused shortness of breath, dizziness, and rapid fatigue. (*Id.*) He also had open wounds on his leg and buttocks; despite surgery on the latter, the remaining wound there made it "unacceptable" for him "to even just sit in this chair like this right now." (*Id.*, p. 15.) He described his pain as "excruciating." (*Id.*, p. 22.)

{¶ 57} Coleman said that his direct flight from Cincinnati to Las Vegas when he moved there was the last time he had traveled by airplane, and that he did so against the

advice of his doctors at that time. (*Id.*, p. 18.) During that flight, "I was passing out on the airplane, had sweats and stuff" (*id.* p. 19), and he went "[s]traight to the hospital" for an extended stay upon landing. (*Id.*, p. 20.) He said he acquired pneumonia and a urinary tract infection during that flight. (*Id.*, p. 19.) According to Coleman, his physician at the time of the hearing had told him that he could not fly and had provided a letter to that effect. (*Id.*, p. 11, 21, 31.) He also said that he would not have appropriate healthcare resources readily available to him in Dayton. (*Id.*, p. 22-23.) Coleman testified that even his 35-minute trip by car to participate in the status conference was "painful" (*id.*, p. 15), and he was trying to avoid taking pain medications in addition to all the other medications he had to take. (*Id.*, p. 22.)

{¶ 58} In addition, a representative of the prosecutor's office testified that no nonstop commercial flights between Las Vegas and Dayton were available for the days prior to the scheduled trial date, and that Coleman would be required to fly into some more distant airport (e.g., Columbus or Cincinnati), requiring additional driving time of 60 to 90 minutes, if he were to travel to Dayton for Howard's trial. (*Id.*, p. 6-10.)

{¶ 59} The evidence presented to the trial court sufficed to establish the necessity that Coleman testify remotely from Las Vegas rather than being required to travel to Dayton to appear at trial in person. We are not dissuaded from that conclusion by Howard's citation to *State v. Oliver*, 2018-Ohio-3667, 112 N.E.3d 573 (8th Dist.). In *Oliver*, the appellate court concluded that the trial court erred by allowing a witness residing in Florida to testify by Skype, because that witness "was not unavailable," but merely would be "inconvenienced" if she were required to travel to Ohio to personally appear at trial. *Id.* at ¶ 24. The facts here are readily distinguishable; Coleman's circumstances presented

a matter not of simple convenience, but of potentially serious health consequences. Furthermore, in *Oliver*, the same appellate court concluded that the trial court was justified in permitting a different witness to testify remotely from Kentucky, as that witness was caring for her husband who was undergoing dialysis following a liver transplant. *Id.* at ¶ 22. The trial court did not err by concluding that permitting Coleman to testify remotely was justified.

{¶ 60} We also do not find persuasive Howard's contention that Coleman's remote testimony did not satisfy the Confrontation Clause's reliability requirement. Both the written transcript and the courtroom recording of Coleman's testimony reflect that he was sworn prior to testifying at trial. (*See* Trial Tr. p. 587; CD Tr. of Jury Trial filed on 8/21/19, Disc 1.) Additionally, both forms of transcript show that Howard's trial counsel was able to conduct a live cross-examination of Coleman before the jury. (Trial Tr. p. 623-646; CD Tr. of Jury Trial filed on 8/21/19, Disc 1.) The video transcript further suggests that the trial judge, jury, defense counsel, and Howard himself would have been able to observe Coleman's demeanor while he testified. (*See* CD Tr. of Jury Trial filed on 8/21/19, Disc 1.)

{¶ 61} Although Howard now faults the trial court, his own trial attorney, and the prosecutor for allegedly not "ensur[ing] that [Howard] could visibly see Mr. Coleman while testifying or hear Mr. Coleman while testifying" (Brief of Defendant/Appellant, p. 9), nothing in the record substantiates Howard's implication that he may not have been able to see or hear Coleman clearly. In a conference with the attorneys immediately prior to Coleman's trial testimony, the trial court specifically noted that Coleman previously had testified via the same remote system for the status conference hearing "and his testimony

was clear both visually and audibly." (Trial Tr., p. 582.) The video transcript of Coleman's trial testimony shows that Coleman's image was projected onto a large screen in the courtroom, with a smaller inset image of each attorney's turn at the podium and the courtroom behind the podium in the background. Coleman's image and voice are clear and understandable and his demeanor is readily observable on the video recording.

{¶ 62} Further, we do not accept Howard's suggestion that Coleman did not identify Howard at trial because Howard and Coleman "likely * * * were not within each other's line of vision." (Brief of Defendant/Appellant, p. 10.) The record shows that the prosecutor never asked Coleman to identify Howard inside the courtroom, an omission that provides a far more reasonable explanation for the lack of an in-court identification by Coleman. While the video recording may not depict the precise vantage point Howard had for viewing and listening to Coleman's testimony, neither Howard nor his attorney voiced any concern during the trial regarding Howard's ability to see or hear that testimony. We can find no error where nothing in the record supports an inference that Howard actually experienced difficulty seeing or hearing Coleman's testimony.

{¶ 63} Howard's first assignment of error is overruled.

**Howard's Assignment of Error # 2 – Sufficiency/Manifest Weight of the Evidence**

{¶ 64} In his second assignment of error, Howard maintains that the evidence presented at trial was insufficient to support a guilty verdict as to the charges against him, and that his conviction also was against the manifest weight of the evidence. More specifically, Howard argues that the State failed to connect him through either ballistics or DNA evidence to the bullets that struck Hall and Coleman. He argues that the State thus failed to prove beyond a reasonable doubt the causation element of felonious

assault, and thereby also failed to prove murder as the proximate result of felonious assault.

{¶ 65} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The relevant inquiry is whether any rational finder of fact, after viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id.*

{¶ 66} In contrast, a weight-of-the-evidence argument "challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Jones*, 2d Dist. Montgomery No. 28179, 2019-Ohio-2940, ¶ 13, quoting *Wilson* at ¶ 12. When evaluating whether a conviction was against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). We generally defer to the credibility assessments of triers of fact able to observe the witnesses' demeanor while testifying. *See State v. Hagen*, 2d Dist. Champaign No. 2018-CA-2, 2018-Ohio-4045, ¶ 21.

*a. Sufficiency of the evidence*

{¶ 67} Reviewing the evidence in a light most favorable to the prosecution, we conclude that the evidence presented at trial was sufficient to prove beyond a reasonable doubt that Howard was guilty of felonious assault on both Coleman and Hall, resulting in Hall's death,[8] and thus also was guilty of murder. The elements of felonious assault (serious physical harm) are that the defendant knowingly caused serious physical harm to the victim. R.C. 2903.11(A)(1). Similarly, felonious assault (deadly weapon) requires proof that the defendant knowingly caused or attempted to cause physical harm to the victim by means of a deadly weapon. R.C. 2903.11(A)(2). Both murder counts against Howard required proof that he caused Hall's death as a proximate result of committing or attempting to commit felonious assault, whether by causing serious physical harm or by means of a deadly weapon. R.C. 2903.02(B).

{¶ 68} The State's forensic pathologist testified that Hall was killed by a single bullet to the head fired from a distance of two feet or more. Coleman testified that both he and Hall were struck by bullets fired from a two-toned Dodge Magnum. Rayfield Lewis testified that at the time of the shootings, Howard was driving the Dodge Magnum from which the shots on Coleman's Dodge Charger were fired. In addition, multiple other witnesses, including the Dodge Magnum's registered owner, testified that such car belonged to Howard and/or that he frequently was seen driving it. Some of those

---

[8] While Howard's appellate brief does not directly challenge his convictions for discharging a firearm on or near prohibited premises, those offenses are established by proof that the defendant recklessly discharged a firearm upon or over a public road or highway. R.C. 2923.162(A)(3)(c)(4). For the reasons stated in our analysis that follows, we conclude that Howard's convictions under R.C. 2923.162(A)(3)(c)(4) also were supported by sufficient evidence and were not against the manifest weight of the evidence.

witnesses placed Howard with that vehicle in the parking lot at the Coast immediately before the shootings. Significantly, even Howard's half-brother, Chappel, presented by the defense to refute Howard's involvement, admitted on cross-examination that Howard was among the group that confronted Hall at the Coast in the early morning hours of January 23, 2018, and that his (Chappel's) previous statements to the police placed Howard in the Magnum at the time of the shootings. Based on that evidence, the jury reasonably could have concluded beyond a reasonable doubt that Howard was driving or otherwise present in the Dodge Magnum at the time of the shootings.

{¶ 69} Although the State's ballistics expert was unable to tie the bullets that struck Coleman, Hall, and their vehicle to a particular gun, she did rule out the guns belonging to Coleman and Hall as the source of the fatal bullet. Extensive testimony as well as video recordings and other physical evidence also supported a conclusion that Howard's Dodge Magnum was involved in the shootings. The trial court's instructions advised the jury that Howard could be found guilty of the charges against him due to aiding and abetting another in committing those offenses, even if he were not the principal offender. (Trial Tr., p. 1235); *see* R.C. 2923.03(A)(2). Under a complicity theory, "participation in criminal intent may be inferred from presence, companionship, and conduct before and after the offense is committed." (Citation omitted.) *State v. Johnson*, 93 Ohio St.3d 240, 245, 754 N.E.2d 796 (2001). Accordingly, despite the State's inability to present fingerprints, DNA, or ballistics evidence directly linking Howard to a gun or to the bullets fired at Coleman's car, the evidence before the jury was sufficient to support a guilty verdict on all the charged offenses.

{¶ 70} We are not dissuaded from that conclusion by Howard's argument that the

State's ballistics expert failed to identify the specific distinguishing characteristics that led her to conclude that neither Coleman's nor Hall's gun was the source of the bullet that killed Hall or of other bullets and shell casings found on top of the Dodge Magnum and along Gettysburg Avenue. Inempolidis testified that she excluded the Kahr and the Ruger due to class characteristics differentiating the physical evidence found from test bullets fired from the victims' weapons. While she indicated that she "would have to see my notes" to know the particular class characteristic on which her conclusion relied, she explained that "either the riffling [sic] was different" or "the number * * * or the widths [of the lands and grooves marking the bullets] were different." (Trial Tr., p. 895-897.) Her prior testimony expanded on the meanings of those terms. Despite extensively cross-examining Inempolidis, defense counsel did not delve into the specifics recorded in her testing notes in an attempt to challenge her exclusion of the Kahr and the Ruger. Further, undisputed evidence that Coleman was shot in the back and Hall was shot through the head while fully reclined in the front passenger seat could have allowed the jury to deduce that such shots were not fired by Coleman or Hall. The evidence was sufficient to sustain the guilty verdicts.

*b. Manifest weight of the evidence*

{¶ 71} As noted above, the sole evidence presented by the defense was the testimony of Howard's half-brother, Chappel, the impeachment of which actually served to inculpate Howard as to the charged offenses. Given the lack of exculpatory evidence, we cannot say that the jury "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. Howard's challenge based on the manifest weight of

the evidence is not well taken.

{¶ 72} His second assignment of error is overruled.

**Howard's Assignments of Error #3, #4 – Ineffective Assistance/Cumulative Effect**

{¶ 73} Howard's third assignment of error contends that he was denied the effective assistance of counsel due to his trial attorney's failure to impeach the trial testimony of David Coleman and Rayfield Lewis, as well as his attorney's failure to argue that Howard was not in the vehicle from which the bullets that struck Hall and Coleman were fired. In his fourth assignment of error, Howard argues that the cumulative effect of his trial attorney's identified omissions denied him a fair trial. We will analyze these two assignments together.

*a. Ineffective Assistance of Counsel*

{¶ 74} To establish ineffective assistance of counsel, a defendant must demonstrate both that trial counsel's conduct fell below an objective standard of reasonableness and that the errors were serious enough to create a reasonable probability that, but for the errors, the outcome of the case would have been different. *See Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley,* 42 Ohio St.3d 136, 141-142, 538 N.E.2d 373 (1989). Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis for a finding of ineffective assistance of counsel. *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992); *State v. Fields*, 2017-Ohio-400, 84 N.E.3d 193, ¶ 38 (2d Dist.).

{¶ 75} Trial counsel also is entitled to a strong presumption that his or her conduct

fell within the wide range of reasonable assistance. *Strickland* at 689. The reviewing court's focus is not simply on "whether an isolated instance of counsel's performance fell below the standard of professionally acceptable conduct," but on "whether [the] defendant had access to a fair trial." *State v. Malone*, 2d Dist. Montgomery No. 10564, 1989 WL 150798, *3 (Dec. 13, 1989).

**{¶ 76}** Howard first faults his trial attorney for not "impeach[ing] Mr. Coleman for his prior criminal convictions." (Brief of Defendant/Appellant, p. 21.) The record contains the following information about Coleman's prior convictions, related during a sidebar conference before his trial testimony was presented to the jury:

> [Prosecutor]: I wanted to bring up, Mr. Coleman does have felony prior convictions that fit under the rules of impeachment under Evidence Rule 609.

> He also has some felony possession of drug convictions. They're felony 5s, which the State asserts do not fall under the requirements of 609, because the prison sentence does not exceed one year, and a couple of them are too old I believe as well.

> The Court: Okay. The Court's understanding of Rule 609 is that the penalty has to be excess of one year. F-5s, as everyone knows, is up to one year, and these offense are not a crime of dishonesty, or a theft; is that correct?

> [Prosecutor]: Right. That is correct.

> The Court: All right. Any response, [defense counsel, to] that?

> [Defense counsel]: No, Your Honor.

The Court: Therefore, I will order that any reference to his conviction for felonies of the fifth degree, so long as they're drug related, they're not related to dishonesty, or theft, would be I think be excluded under 609.

(Trial Tr., p. 593.)

{¶ 77} During Coleman's direct examination, he acknowledged that he had prior felony convictions in Montgomery County for aggravated robbery (two counts), abduction, having weapons under disability (two convictions), and aggravated assault, and that he was not legally permitted to carry a firearm. (*Id.*, p. 614.) Defense counsel did not delve further into those convictions on cross-examination, but his failure to do so did not constitute ineffective assistance of counsel. The jury had been made aware of Coleman's prior convictions that were admissible under Evid.R. 609 and apparently found that such convictions did not undermine the credibility of his testimony regarding the pivotal issues in this case. Furthermore, while Howard asserts that Coleman's prior record may have given him cause to misrepresent the order in which the shots were fired, to avoid being charged for having fired first, that motivation to lie would exist regardless of Coleman's prior record.

{¶ 78} Additionally, as illustrated by his closing argument, his trial attorney premised Howard's defense on the theory that Howard was not even present in the Dodge Magnum from which the shots that struck Hall and Coleman were fired. That trial strategy rendered the order of shooting irrelevant, so counsel's failure to draw the jury's attention to Coleman's alleged motive to lie about that issue will not give rise to an ineffective assistance of counsel claim. Finally, the decision to forego exploring the criminal history

of a witness with paraplegia who was exhibiting physical discomfort[9] while testifying may itself have been a matter of reasonable trial strategy.

{¶ 79} Howard also criticizes his trial counsel for not challenging Coleman's testimony that he fired at the two-toned Dodge Magnum in "[s]elf-defense" only after the occupants of that vehicle first shot at and struck him and Hall. (*See* Trial Tr., p. 608-611.) For the same reasons discussed above with regard to Coleman's prior felony record, Howard's counsel did not provide deficient representation by failing to more rigorously question Coleman about the order in which the two vehicles' occupants discharged their weapons. Multiple witnesses testified that Howard, Michael, and their associates were armed and looking for Hall, and that the group aggressively confronted Hall in the parking lot at the Coast about their suspicion that Hall had broken into Michael's apartment. Multiple witnesses also testified that Howard was known to drive the two-toned Dodge Magnum, and that Howard's Magnum followed Coleman as he (Coleman) drove away from the Coast with Hall as his passenger. Video evidence also depicted the Dodge Magnum's leaving the Coast's parking lot behind Coleman's vehicle.

{¶ 80} In contrast, no evidence suggested that Coleman or Hall sought out or attempted to pursue the occupants of the Dodge Magnum, or that they had a motive to do so. Absent any evidence suggesting that Coleman or Hall fired first, we have no reason to believe that defense counsel's further questioning of Coleman about his version of events likely would have led to a not-guilty verdict. Furthermore, for purposes of a defense based on the State's purported failure to prove that Howard was in the Dodge Magnum

---

[9] Both the written and video transcript show that Coleman complained of experiencing muscle spasms during his testimony. (*See* Trial Tr., p. 647.)

at the time of the shootings, the order in which shots were exchanged between the two cars was not significant, and defense counsel was not deficient for failing to press Coleman on that issue. Indeed, as observed above, the decision not to challenge a sympathetic witness about the details of the events that led to his disability may have been strategic, and cannot serve as the basis for an ineffective assistance of counsel claim.

{¶ 81} Howard likewise faults his attorney for failing to impeach Lewis with his prior criminal record. With regard to the cross-examination of Lewis, the record reflects that after the prosecution introduced the matter of Lewis's previous felony conviction (*see* Trial Tr., p. 462), defense counsel did briefly question Lewis about his prior conviction for aggravated robbery. (*Id.*, p. 463.) He also argued in closing that the jury should consider that conviction when determining whether to believe Lewis's testimony. (*Id.*, p. 1188.) The possible effect of that conviction on Lewis's credibility was before the jury to consider.

{¶ 82} Although Howard asserts that his trial attorney also "should have [but] failed to elicit testimony from Mr. Lewis that [Howard] was not driving or * * * in the [Dodge] Magnum at the actual time when the gunfire occurred" (Brief of Defendant/Appellant, p. 22-23), he offers no guidance as to *how* defense counsel should have elicited such testimony from a witness who repeatedly and confidently maintained the opposite both on direct and in his initial statement to police. An attorney cannot be found constitutionally ineffective due to failing to produce exculpatory evidence only speculated to have been available. *See, e.g., State v. Campbell*, 4th Dist. Athens No. 08CA31, 2009-Ohio-4992, ¶ 15; *State v. Hammond*, 8th Dist. Cuyahoga No. 100656, 2014-Ohio-4673, ¶ 26; *In re C.P.*, 10th Dist. Franklin No. 08AP-1128, 2009-Ohio-2760, ¶ 64. Additionally, the

acknowledgment of Howard's older brother (Chappel) that his (Chappel's) police interview placed Howard inside the Magnum when it followed Coleman's vehicle out of the parking lot at the Coast (*see* Trial Tr., p. 1142-1144) lessens the likelihood that the jury could have been convinced Howard was not in the Magnum at the time of the shooting.

{¶ 83} Finally, defense counsel *did* argue in closing that the State had failed to prove that Howard was inside the Dodge Magnum at the time of the shooting. (*See* Trial Tr., p. 1184-1199.) He noted that the registered owner of that car testified that Howard was not the only person to sometimes drive the Magnum. (*Id.*, p. 1186; *see also* p. 320-321.) He also reminded the jury that certain other prosecution witnesses had been unable to identify Howard as the Magnum's driver at the time of the shootings (*id.*, p. 1186-1187, 1189), and he attempted to cast doubt on the credibility of the witnesses who did incriminate Howard. (*Id.*, p. 1188-1189.) He reviewed the forensic evidence and urged that such evidence was insufficient to show that Howard was present during the shootings. (*Id.*, p. 1189-1196.) Defense counsel also replayed the video compilation for the jury, arguing that it suggested an alternative perpetrator. (*Id.*, p. 1196-1199.) Howard has not identified any additional evidence or argument that his attorney could or should have presented that would have made a different verdict reasonably probable.

{¶ 84} Howard's third assignment of error, alleging he was denied the effective assistance of counsel, is overruled.

*b. Cumulative Effect of Errors*

{¶ 85} Under the doctrine of cumulative error, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of error does not individually constitute cause for

reversal. *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223, citing *State v. DeMarco,* 31 Ohio St.3d 191,196-197, 509 N.E.2d 1256 (1987); *State v. Hunter,* 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 132; *State v. Garner,* 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995). A claim of cumulative error based on the ineffective assistance of counsel would require a determination that while no single act by trial counsel met the standard set forth in *Strickland*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, the cumulative effect of counsel's conduct satisfied the *Strickland* standard. *State v. Jordan*, 2d Dist. Montgomery No. 27208, 2017-Ohio-7342, ¶ 55.

{¶ 86} The only alleged errors that Howard identifies in support of his cumulative error argument are the same examples of purportedly deficient performance by his trial attorney on which he based his ineffective assistance of counsel claim. Having concluded that Howard's trial attorney did not fail to provide effective assistance for constitutional purposes, we likewise conclude that the cited examples of such attorney's purported deficiencies did not in combination deny Howard a fair trial.

{¶ 87} Howard's fourth assignment of error is overruled.

### State's Cross-Appeal – Sentencing Error as to Merger

{¶ 88} In its cross-appeal, the State urges that the trial court erred by merging all of the three-year firearm specifications to the offenses of which Howard was convicted, then sentencing Howard on a single three-year firearm specification plus a single five-year firearm specification. The State argues that the trial court was obligated by statute to impose sentences on at least two of the three-year specifications of which Howard was found guilty, in addition to sentencing him on a merged five-year specification.

{¶ 89} In reviewing felony sentences, appellate courts must apply the standard of

review set forth in R.C. 2953.08(G)(2), rather than an abuse of discretion standard. *See State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 9. Under R.C. 2953.08(G)(2), an appellate court may increase, reduce, or modify a sentence, or it may vacate the sentence and remand for resentencing, only if it "clearly and convincingly" finds either (1) that the record does not support certain specified findings, or (2) that the sentence imposed is contrary to law. *State v. Huffman*, 2d Dist. Miami No. 2016-CA-16, 2017-Ohio-4097, ¶ 6.

{¶ 90} The offenses and specifications of which Howard was found guilty, and the trial court's disposition of them, were as follows:

| As to Darius Hall | Offense | R.C. section | Result |
|---|---|---|---|
| **Count I** | Murder (proximate result/ felonious assault (serious physical harm)) | 2903.02(B) | Sentenced to 15 years to life |
| | 5-year firearm specification | 2929.146(A) | Sentenced to 5 years, to run prior/consecutive to sentence on Count I |
| | 3-year firearm specification | 2941.145(A) | Sentenced to 3 years, to run prior/consecutive to sentences on Count I and 5-year specification to Count I |

| | | | |
|---|---|---|---|
| **Count II** | Murder (proximate result/ felonious assault (deadly weapon)) | 2903.02(B) | Merged with Count I |
| | 5-year firearm specification | 2929.146(A) | ---------- |
| | 3-year firearm specification | 2941.145(A) | ---------- |
| **Count III** | Felonious Assault (serious physical harm) | 2903.11(A)(1) | Merged with Count I |
| | 5-year firearm specification | 2929.146(A) | ----------- |
| | 3-year firearm specification | 2941.145(A) | ----------- |
| **Count IV** | Felonious assault (deadly weapon) | 2903.11(A)(2) | Merged with Count I |
| | 5-year firearm specification | 2929.146(A) | ---------- |
| | 3-year firearm specification | 2941.145(A) | ---------- |
| **Count VII** | Discharge of firearm on or near prohibited premises (public roadway) | 2923.162(A)(3)(C)(4) | Sentenced to 8 years, to run concurrent with other sentences |
| | 3-year firearm specification | 2941.145(A) | Merged with 3-year specification to Count I |

| As to David Coleman | Offense | R.C. section | Result |
|---|---|---|---|
| **Count V** | Felonious assault (serious physical harm) | 2903.11(A)(1) | Sentenced to 8 years, to run consecutive to sentences on Count I & specifications thereto |
| | 5-year firearm specification | 2929.146(A) | Merged with 5-year specification to Count I |
| | 3-year firearm specification | 2941.145(A) | Merged with 3-year specification to Count I |
| **Count VI** | Felonious assault (deadly weapon) | 2903.11(A)(2) | Merged with Count V |
| | 5-year firearm specification | 2929.146(A) | ---------- |
| | 3-year firearm specification | 2941.145(A) | ---------- |
| **Count VIII** | Discharge of firearm on or near prohibited premises (public roadway) | 2923.162(A)(3)(C)(4) | Sentenced to 8 years, to run concurrent with all other sentences |
| | 3-year firearm specification | 2941.145(A) | Merged with 3-year specification to Count I |

{¶ 91} Citing R.C. 2929.14(B)(1)(g), the State contends that the sentence imposed by the trial court is contrary to law because the circumstances of Howard's convictions mandate that he be sentenced on at least two of the three-year firearm specifications of which he was found guilty. We have recognized that, while "[u]nder R.C. 2929.14(B)(1)(b), a trial court ordinarily may not impose more than one prison term for firearm specifications for felonies that were committed as part of the same act or transaction[,] * * * R.C. 2929.14(B)(1)(g) creates an exception." *State v. Boyd*, 2d Dist. Clark No. 2018-CA-68, 2019-Ohio-1902, ¶ 31. That statutory exception, on which the State here relies, provides as follows:

> If an offender is convicted of or pleads guilty to two or more felonies, if one or more of those felonies are aggravated murder, murder, attempted aggravated murder, attempted murder, aggravated robbery, felonious assault, or rape, and if the offender is convicted of or pleads guilty to a specification of the type described under division (B)(1)(a) of this section in connection with two or more of the felonies, the sentencing court *shall impose* on the offender *the prison term specified* under division (B)(1)(a) of this section *for each of the two most serious specifications* of which the offender is convicted or to which the offender pleads guilty and, in its discretion, also may impose on the offender the prison term specified under that division for any or all of the remaining specifications.

(Emphasis added.) R.C. 2929.14(B)(1)(g).

{¶ 92} Under the subsection referenced therein, "an offender who is convicted of * * * a felony [and] also is convicted of * * * a specification of the type described in [R.C.]

* * * 2941.145" must be sentenced to:

> [a] prison term of three years if the specification * * * charges the offender with having a firearm on or about the offender's person or under the offender's control while committing the offense and displaying the firearm, brandishing the firearm, indicating that the offender possessed the firearm, or using it to facilitate the offense.

R.C. 2929.14(B)(1)(a)(ii).

{¶ 93} Consistent with R.C. 2929.14(B)(1)(g), Howard was convicted both of Hall's murder and of felonious assault on Coleman. Consistent with R.C. 2929.14(B)(1)(a)(ii), he also was found guilty under R.C. 2941.145(A) of a three-year firearm specification in connection with each of those two felonies. Because those specifications fall among those explicitly excepted from sentencing on a single specification, "[p]ursuant to R.C. 2929.14(B)(1)(g), the trial court was statutorily required to impose separate sentences for two of the most serious firearm specifications * * * related to * * * murder and felonious assault." See State v. Rosales, 2d Dist. Montgomery No. 27117, 2018-Ohio-197, ¶ 28.

{¶ 94} Although the trial court imposed sentences for both the five-year specification and the three-year specification related to Howard's murder conviction, the State maintains that those sentences did not comply with the court's obligation to sentence Howard on "each of the two most serious specifications" of which he was convicted under R.C. 2941.145(A). See R.C. 2929.14(B)(1)(g), (B)(1)(a)(ii). We agree. Imposition of a five-year sentence on a specification for discharging a firearm from a vehicle is mandatory under R.C. 2941.146, and thus does not fulfill R.C. 2929.14(B)(1)(g)'s requirements as to convictions for specifications under R.C. 2929.145.

{¶ 95} Further, pursuant to R.C. 2929.14(B)(1)(c)(iii),

[i]f a court imposes an additional prison term on an offender under division (B)(1)(c) of this section relative to an offense, the court also shall impose a prison term under division (B)(1)(a) of this section relative to the same offense, provided the criteria specified in that division for imposing an additional prison term are satisfied relative to the offender and the offense.

{¶ 96} In other words, as we previously have observed:

When firearm specifications under both R.C. 2941.145 and 2941.146 accompany the same offense and are both found true, a court must impose a 3-year term under R.C. 2929.14(D)(1)(a)(ii) and a 5-year term under R.C. 2929.14(D)(1)(c).

*State v. Hudson*, 2d Dist. Montgomery No. 23328, 2010-Ohio-1622, ¶ 8, fn. 8, citing *State v. Gresham,* 8th Dist. Cuyahoga No. 81250, 2003-Ohio-744, ¶ 14.

{¶ 97} Because Howard was found guilty of firearm specifications under both R.C. 2941.145 and 2941.146 for the same murder offense, the trial court was required to impose both a three-year and a five-year prison term for the two specifications to that offense. Further, R.C. 2929.14(B)(1)(g) required the court to impose at least one additional three-year term, in order to punish Howard for "each of the two most serious [R.C. 2941.145] specifications of which" he was found guilty – i.e., to sentence Howard on one three-year specification in relation to each of the murder and felonious assault offenses as to which the trial court entered a judgment of conviction. The trial court erred as a matter of law by merging the three-year firearm specification to Howard's conviction for felonious assault on Coleman with the three-year firearm specification to his conviction

for Hall's murder, and thereby failing to impose a second three-year sentence on the three-year firearm specifications to Howard's crimes.

## Conclusion

**{¶ 98}** For the foregoing reasons, the judgment of the trial court will be reversed as to the trial court's merger of all three-year firearm specifications, and this matter will be remanded for the imposition of an additional three-year firearm specification as required by R.C. 2929.14(B)(1)(g). The judgment will be affirmed in all other respects.

. . . . . . . . . . .

TUCKER, P.J. and HALL, J., concur.


Copies sent to:

Mathias H. Heck Jr.
Heather N. Ketter
Jon Paul Rion
Catherine H. Breault
Hon. Dennis J. Adkins